Judge Droney dissents in a separate opinion.
Bolden, District Judge:
*418 In Fratello v. Archdiocese of New York , 863 F.3d 190 (2d Cir. 2017), this Court recently addressed the Supreme Court's decision in Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C ., 565 U.S. 171, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012), adopting the "ministerial exception" doctrine and recognizing that the First Amendment protects religious employers from employment discrimination lawsuits brought by their ministers. This case requires us to address the doctrine once again and determine whether a hospital-only historically connected to the United Methodist Church but still providing religious services through its pastoral care department-can invoke it. We hold that it can.
Between 2004 and 2011, Marlon Penn worked at the New York Methodist Hospital ("NYMH") as a Duty Chaplain. Peter Poulos, as Director of the Pastoral Education Program and the Department of Pastoral Care, supervised Mr. Penn's employment. In November 2011, NYMH and Mr. Poulos terminated Mr. Penn's employment. On December 12, 2011, Mr. Penn filed suit, bringing claims under Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and the anti-discrimination laws of both the State and City of New York. Defendants-Appellees moved for summary judgment, arguing that the Establishment and Free Exercise Clauses of the First Amendment barred Mr. Penn's claims. The district court (Nelson Román, Judge), granted summary judgment. We affirm.
I. BACKGROUND
A. The History of New York Methodist Hospital
Founded in 1881 at the "behest" of a Methodist minister and with financing from a Methodist philanthropist, Joint App'x at 383, the United Methodist Church established NYMH, the first Methodist hospital in the world. Joint App'x at 108-110. In 1975, however, NYMH amended its Certificate of Incorporation to remove all reference to its "Church related character" and "relationship with The United Methodist Church." Joint App'x at 43. It also deleted from the Certificate of Incorporation the requirement that the Bishop of the New York area United Methodist Church and the President of the Guild of the Methodist Hospital be "trustees ex-officio." Joint App'x at 293, 401. Now, NYMH's Articles of Incorporation do not mention religious activity or a religious mission. Instead, the Articles state that "the purpose of the corporation is to establish, maintain, operate and conduct a hospital including an infirmary, dispensary or clinic for the medical and surgical aid, care and treatment of persons in need thereof." Joint App'x at 292.
*419 NYMH also promotes its secular nature. For example, the "Welcome Letter" from Executive Vice President Stanley Sherbell to new medical residents at NYMH, which is published on the hospital's webpage, calls the hospital a "secular institution." Joint App'x at 353. Additionally, NYMH "downsized" its "Department of Church Relations" about fifteen years ago, according to Lyn Hill, NYMH's Vice President of Communication and External Affairs. Joint App'x at 393. The record also reveals that NYMH does not have a formal relationship with the United Methodist Association of Health and Welfare Ministries. Joint App'x at 433.
Nevertheless, vestiges of NYMH's religious heritage remain. It has steadfastly kept the word "Methodist" in its name, despite organizational and operational changes. In 1993, for example, NYMH became affiliated with the New York-Presbyterian Health Care system, but continued to call itself a "Methodist" hospital. Joint App'x at 51. More than twenty years ago, but after the amendment of NYMH's Certificate of Incorporation, the United Methodist Association Journal observed that "the [hospital's] Methodist influence can still be seen in the hospital through the philosophy of equality, individual attention, charity, faith, and hope that is communicated to NYMH employees every day." Joint App'x at 108-10. The article also highlighted the hospital's Methodist archives project, the twenty-four hour service provided by the pastoral care department, and the memorial plaque in front of NYMH commemorating its "status as the first Methodist hospital in the world." Id.
In 2006, NYMH produced a booklet commemorating its 125th anniversary and noted "its identity as the mother hospital of Methodism." Joint App'x at 60. The Hospital's current Employee Handbook also emphasizes this history, Joint App'x at 68, and states that its mission is "to provide an active ecumenical program of pastoral care and conduct[ ] a clinical pastoral program." Joint App'x at 67.
NYMH's by-laws continue to require "significant representation from the community and the United Methodist Church" on its Board of Trustees. Joint App'x at 56; Joint App'x at 84-85. When Mr. Penn filed suit, three of NYMH's seventeen Board members, including the Chairman, were Methodist ministers. Joint App'x at 383. The three ministers did not serve as representatives of the Church on the Board of Trustees, however, and NYMH could not identify how exactly they were appointed. Joint App'x at 351. The by-laws further require NYMH to select a president "with the advice and counsel of the Bishop of the New York area of the United Methodist Church." Joint App'x at 56. The Order of Business in the by-laws also mandates that every regular Board meeting begin with prayer. Joint App'x at 56, 89.
NYMH has retained significant aspects of its religious heritage in other ways. At the hospital's employee orientation, Chaplain Peter Poulos reminds every employee that "patients are human beings who are created in the image of God." Joint App'x at 52. Additionally, the hospital has a "pastor's clinic" for several week-long sessions each year, where it offers free health screenings and educational programming to ten to twelve Methodist ministers and their spouses. Joint App'x at 383. The hospital also makes a yearly philanthropic appeal to the "Methodist churches in [its] community." Id.
B. NYMH's Department of Pastoral Care
This case specifically concerns NYMH's Department of Pastoral Care. The Department of Pastoral Care's mission is to provide an "ecumenical program of pastoral *420 care" to patients and to "see that the needs of the whole person-mind and spirit as well as body-are met." Joint App'x at 356. Appellee Peter Poulos is the director of the Department and also directs its pastoral training program. Joint App'x at 358.
Staff Chaplains at NYMH counsel patients, including those who are making end-of-life decisions, and "facilitate the patient's receiving [of] the rituals and practices of his/her own faith tradition when requested." Joint App'x at 363. A chaplain in the Department of Pastoral Care is required:
• To minister to patients, their families, and staff in his/her assigned patient units in accordance with the protocols and procedures of the Department of Pastoral Care;
• To facilitate the patient's receiving the rituals and practices of his/her own faith tradition when requested;
• To counsel patients and families, who struggle with how their faith/belief systems influence the way they deal with hospitalization and decisions they may need to make;
• To counsel patients, families and staff as they deal with experiences of significant change, grief and loss;
• To offer prayer, ritual, devotional materials to patients and families when requested; and
• To participate in coordinating and conducting chapel services as requested by the Director (holiday services, employee memorial services, Sunday worship services, etc.).
Joint App'x at 407.[1] According to Vice President Hill, every chaplain is considered "clergy." Joint App'x at 43. Formal ordination is not a requirement for chaplaincy, but a Staff Chaplain must have a Master's Degree in Divinity or equivalent and four units of Clinical Pastoral Education credits at any accredited training center. Joint App'x at 368.
The Department of Pastoral Care seeks to accommodate various faiths. Joint App'x at 80; Joint App'x at 363 (agreeing to the statement "if it is necessary, you can get a chaplain from any religion, even if the hospital does not have such a chaplain on staff"). It maintains religious spaces for non-Methodists and coordinates the "hospital's meeting the different needs of the religious denominations represented in our patient population." Joint App'x at 359.
The Department of Pastoral Care is integrated into NYMH's non-pastoral work. At times, it coordinates religious events for non-pastoral staff. Mr. Poulos stated that he is often asked to say prayers at the opening of "ceremonies, graduations, [and] employee recognition [events]," and that he leads an orientation on Methodism for new staff. Joint App'x at 362. Additionally, representatives of the Department sit on NYMH's "interdisciplinary committees" for bioethics and "hospice/palliative care," as well as the institutional review board for research projects. Joint App'x at 367.
C. Mr. Penn's Employment at NYMH
Marlon Penn, an African-American Methodist, served as a Chaplain Trainee (or "Resident Chaplain") at NYMH's Clinical *421 Pastoral Education Residency Program from January 2002 to July 2004. Joint App'x at 439. In July 2004, NYMH hired him as a Duty Chaplain. As Mr. Penn readily admits, he was "primarily responsible for ministry" in this role. Joint App'x at 238. He also coordinated the distribution of Bibles, conducted an in-hospital memorial service for an employee who died, and "maintained ... active, on-going pastoral care to staff." Id.
During his tenure at NYMH, Mr. Penn "repeatedly requested" that NYMH promote him to a full-time Staff Chaplain position. Joint App'x at 449. Despite these requests, NYMH never promoted Mr. Penn. In September 2006, NYMH hired Rabbi Spitz as a full-time Staff Chaplain, without interviewing Mr. Penn. In August 2010, the hospital once again sought a full-time chaplain, this time to replace Sister Therese Camardella. Id. ; Joint App'x at 446. Mr. Penn expressed interest in the position. Mr. Poulos initially tried to replace her with a Catholic and mentioned this to Mr. Penn. When he could not find a viable Catholic candidate, Mr. Poulos offered the position to Joo Hong, who was not Catholic. Id. ; Joint App'x at 450. Mr. Poulos stated that he chose Ms. Hong because she "received very positive feedback" from other chaplains and educators. Id. Mr. Poulos had also "witnessed her strong counseling skills from first hand observation." Id.
Mr. Poulos said that he did not consider Mr. Penn for the Staff Chaplain position for several reasons. One resident had complained to Mr. Poulos that Mr. Penn ended a service with a hymn that was only familiar to a certain group of Christians. Appellee's Br., 13-14. Mr. Poulos and Mr. Penn also disagreed about the importance of "full coverage." Id . According to appellees, this was a "philosophical" disagreement, because Mr. Penn felt that "effective ministry to those in pain/crisis is never contingent on ... time constraints," Joint App'x at 207 (summarizing Mr. Penn's rebuttal statement at the New York Human Rights Commission), and Mr. Poulos disagreed. Nevertheless, during the course of his employment, NYMH also commended Mr. Penn for being "conscientious," "reliable," and "helpful." Joint App'x at 239.
On September 26, 2010, Mr. Penn filed an administrative complaint with the New York City Commission on Human Rights ("CCHR") and the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that Appellees had failed to promote him because of his race and religion. Joint App'x at 457. He also alleged that Appellees failed to reasonably accommodate his religious beliefs, because they did not allow him to take time off on Sunday mornings to attend church services in Mount Vernon, New York. Id . On July 27, 2011, the CCHR dismissed the complaint, concluding that there was "insufficient evidence to substantiate [Mr. Penn's] allegations of discrimination." Joint App'x at 209. On September 22, 2011, the EEOC sent Plaintiff a notice of right to sue, adopting the findings of the CCHR. Penn v. N.Y. Methodist Hosp. , No. 11-cv-9137 (NSR), 2013 WL 5477600, at *2 (S.D.N.Y. Sept. 30, 2013).
After Mr. Penn filed his administrative complaint, Appellees allege, his performance at work began to deteriorate. Appellees pointed to many instances of misconduct. On March 13, 2011, Mr. Penn improperly completed a "referral card," which resulted in a patient dying without receiving last rites. Appellee's Br. at 14 (citing "The Anointing Incident"). On the same day, a woman whose fetus had died complained about Mr. Penn's counseling because he commented on her partner's race. Id . at 15 ("The Fetal Demise Incident"). At an Easter Service in 2011, Mr. *422 Penn told a Catholic nurse that she could not receive communion until the following day, although he purportedly knew that she could receive communion across the street. Id . at 16 ("The April 11, 2011 Easter Service").
Finally, in November 2011, a Resident Chaplain complained to Mr. Poulos that Mr. Penn made sexually inappropriate comments to her and hugged her against her will. Joint App'x at 484-94. After this incident, NYMH's Human Resources Department initiated an investigation into the complaint and eventually decided to end Mr. Penn's employment. Joint App'x at 505.
D. Procedural History
On December 12, 2011, Mr. Penn filed suit in the United States District Court for the Southern District of New York. In his second amended complaint, he asserted that Appellees: (1) discriminated against him on the basis of his race and religion, in violation of Title VII of the Civil Rights Act of 1964 (against NYMH only), and 42 U.S.C. § 1981 (against both Appellees), and (2) retaliated against him after he filed charges with the EEOC and the Human Rights Commission, in violation of Title VII, § 1981, and various state and city laws. See Penn , 2013 WL 5477600, *1-2.
On September 30, 2013, the district court partially granted Appellees' motion to dismiss by: (1) dismissing Plaintiffs claims under 42 U.S.C. § 1981 for discrimination on the basis of his race and religion as against both Appellees; (2) dismissing Mr. Penn's Title VII claim against NYMH with respect to discriminatory actions that occurred before November 12, 2009, as time barred, and (3) dismissing his claim under Title VII for discriminatory termination of employment on the basis of race or religion. See generally Penn , 2013 WL 5477600. The court also concluded that "the well-pleaded allegations in the Complaint, accepted as true, show[ed] that [Mr. Penn] was a ministerial employee," but observed that the allegations did not conclusively establish that "NYMH [wa]s a religious institution or religiously-affiliated." Id. at *6, *9.
On July 8, 2015, Appellees moved for summary judgment, asserting that the ministerial exception barred all of Mr. Penn's remaining claims, and, in the alternative, that no reasonable jury could find for Mr. Penn on his claims of discrimination and retaliation. The district court granted the motion, concluding that the ministerial exception applied. Penn v. N.Y. Methodist Hosp. , 158 F.Supp.3d 177 (S.D.N.Y. 2016). In addressing the issue of "whether NYMH is a 'religious institution' for purposes of the ministerial exception," id. at 182, the court followed the reasoning of another district court decision, Musante v. Notre Dame of Easton Church , 3:01-CV-2352 (MRK), 2004 WL 721774, at *6 (D. Conn. Mar. 30, 2004), and concluded that the "ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employee are both considered in determining whether the exception applies." Id. (citing Rweyemamu v. Cote , 520 F.3d 198, 208 (2d Cir. 2008) ("The more 'pervasively religious' the relationship between an employee and his employer, the more salient the free exercise concern becomes.") ).
The district court noted that "where an employee's role is extensively religious, a less religious employer may still create entanglement issues." Penn , 158 F.Supp.3d at 182. Since Mr. Penn's role at NYMH was "pervasively religious[,] application of the ministerial exception to a less religious institution [was] warranted." Id. The district court further held that NYMH's amendment of its Certificate of Incorporation "sever[ed] all formal ties *423 with the United Methodist Church," but did not "necessarily imply that the Hospital d[id] not maintain any church-based relationship or have any religious characteristics." Id. at 182-83. Indeed, the district court recognized NYMH's "connection with the United Methodist Church," its mission statement which "emphasize[d] an 'ecumenical program of pastoral care,' " and Mr. Penn's own religious identification as a Methodist and deemed these undisputed facts sufficient to warrant the application of the ministerial exception. Id. at 184.
This appeal followed.
II. STANDARD OF REVIEW
We review de novo a grant of summary judgment under Fed. R. Civ. P. 56, assessing whether the district court properly concluded that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. See Ruggiero v. City. of Orange , 467 F.3d 170, 173 (2d Cir. 2006). While "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion," we are "required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant." Davis v. New York , 316 F.3d 93, 100 (2d Cir. 2002) ; Fed. R. Civ. P. 56(e).
III. DISCUSSION
The purpose of the ministerial exception is to "ensure[ ] that the authority to select and control who will minister to the faithful-a matter 'strictly ecclesiastical,' ...-is the church's alone." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C. , 565 U.S. 171, 194-95, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012) (quoting Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am ., 344 U.S. 94, 119, 73 S.Ct. 143, 97 L.Ed. 120 (1952) ); see also Fratello v. Archdiocese of New York , 863 F.3d 190, 199 (2d Cir. 2017) (describing the roots of the ministerial exception in the colonial struggle against a "national church"). The ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." Hosanna-Tabor , 565 U.S. at 195 n.4, 132 S.Ct. 694.
As this Court has previously recognized, "[i]t is the relationship between the activities the employee performs for her employer, and the religious activities the employer espouses and practices, that determines" whether the exception applies. Fratello , 863 F.3d at 205-06. Additionally, as both the Supreme Court and this Court have acknowledged, there is no "rigid formula for deciding when" the exception applies. Hosanna-Tabor , 565 U.S. at 190, 132 S.Ct. 694 ; see also Fratello , 863 F.3d at 204-05 (considering four factors identified in Hosanna-Tabor to evaluate whether individual was a minister within the meaning of the exception, but noting the Supreme Court "instructs only as to what we might take into account as relevant ... it neither limits the inquiry to those considerations nor requires their application in every case.").
Applying these principles here and construing all evidence in the light most favorable to Mr. Penn, see Ruggiero , 467 F.3d at 173, the district court did not err in applying the ministerial exception doctrine.[2] While a close question, NYMH, *424 because of its history and continuing purpose, through its Department of Pastoral Care, is a "religious group," and since Mr. Penn's role within the Department of Pastoral Care was to provide religious care to the hospital's patients and religious care only, the ministerial exception doctrine should be applied.[3] Once applied, its application warrants this lawsuit's dismissal. Any other conclusion risks violating the First Amendment's Religion Clauses, most specifically the Establishment Clause.
A. The Application of the Ministerial Exception Doctrine
While the Hosanna-Tabor decision made clear that the ministerial exception applies to "religious groups" when making employment decisions involving "ministers," see Hosanna-Tabor , 565 U.S. at 196, 132 S.Ct. 694, the Supreme Court did not "adopt a rigid formula for deciding when an employee qualifies as a minister," noting only that "the ministerial exception is not limited to the head of a religious congregation." Id . at 190, 132 S.Ct. 694. The Supreme Court also did not explain how to define a "religious group" to determine who could properly invoke the exception. Id . at 188, 132 S.Ct. 694 (referencing a "religious group's right to shape its own faith and mission through its appointments"). Nevertheless, consistent with the Supreme Court's guidance in Hosanna-Tabor and this Court's recent ruling in Fratello , NYMH is a "religious group," at least with respect to its Department of Pastoral Care.
Both before and after Hosanna Tabor , other circuits have applied the ministerial exception in cases involving "religiously affiliated entit[ies]," whose "mission[s are] marked by clear or obvious religious characteristics." Conlon v. InterVarsity Christian Fellowship, 777 F.3d 829, 834 (6th Cir. 2015) (quoting Shaliehsabou v. Hebrew Home of Greater Wash., Inc. , 363 F.3d 299, 310 (4th Cir. 2004) ). In Shaliehsabou , the Fourth Circuit allowed a Jewish nursing home to invoke the ministerial exception because its "by-laws define[d] it as a religious and charitable non-profit corporation and declare[d] that its mission was to provide elder care to 'aged of the Jewish faith in accordance with the precepts of Jewish law and customs.' " Id. at 310 ; see also Conlon , 777 F.3d at 833-34 ("It is undisputed that InterVarsity Christian Fellowship is a Christian organization, whose purpose is to advance the understanding and practice of Christianity in colleges and universities. It is therefore a 'religious group' under Hosanna-Tabor .").
Courts have also allowed hospitals to invoke the ministerial exception doctrine in employment suits from pastoral staff members. See Hollins v. Methodist Healthcare , 474 F.3d 223, 226 (6th Cir. 2007) ("We agree with this extension of the rule beyond its application to ordained ministers and hold that it applies to the plaintiff in this case, given the pastoral role she filled at the hospital."), rev'd in part on other *425 grounds by Hosanna-Tabor , 565 U.S. at 195 n.4, 132 S.Ct. 694 ; Scharon v. St. Luke's Episcopal Presbyterian Hosps. , 929 F.2d 360, 362 (8th Cir. 1991) ("It cannot seriously be claimed that a church-affiliated hospital providing this sort of ministry to its patients is not an institution with substantial religious character. ... While St. Luke's provides many secular services (and arguably may be primarily a secular institution), in its role as Scharon's employer it is without question a religious organization.") (citations omitted); see also Shaliehsabou , 363 F.3d at 310-11 ("Pursuant to [its] mission, the Hebrew Home maintained a rabbi on its staff, employed mashgichim to ensure compliance with the Jewish dietary laws, and placed a mezuzah on every resident's doorpost. Although we do not have to decide the full reach of the phrase 'religious institution,' we hold that the phrase includes an entity such as the Hebrew Home.").
Mr. Penn argues, however, that NYMH is not a religious institution. He maintains that the hospital is no longer affiliated with the United Methodist Church. Indeed, NYMH took steps to distance itself from its religious heritage. Its by-laws no longer require the hospital to seek permission from the United Methodist Church to make significant business decisions, see Hollins v. Methodist Healthcare , 379 F.Supp.2d 907, 909 (W.D. Tenn. 2005), nor do they give the United Methodist Church the power to veto any amendment to the hospital's articles of incorporation, Scharon , 929 F.2d at 362 (adding that "[t]he hospital's Board of Directors consists of four church representatives and their unanimously agreed-upon nominees").
Furthermore, NYMH's Methodist identity does not infuse its performance of its secular duties, making it less clear that its "mission is marked by clear or obvious religious characteristics." Shaliehsabou , 363 F.3d at 310-11 (observing that the defendant nursing home required staff to comply with religious laws while administering healthcare, hung a mezuzah on each patient's doorway, and stated in its by-laws that its mission was to serve the "aged of Jewish faith"). Except for the several days a year when it offers free pastoral care, NYMH's Methodist affiliation does not pervade its work as a healthcare organization. Mr. Penn also emphasizes that, as the district court acknowledged in its ruling on NYMH's motion to dismiss, "many secular hospitals have chaplains and accredited clinical pastoral education programs." Penn , 2013 WL 5477600, *8.
These arguments, however, ignore how the hospital's Department of Pastoral Care operates and how these operations are "marked by clear or obvious religious characteristics." Conlon , 777 F.3d at 834. The Department of Pastoral Care required chaplains, like Mr. Penn, to distribute Bibles, perform religious rituals and organize and conduct religious services, including Easter services and memorial services. While NYMH may have shed significant aspects of its religious identity by amending its Certificate of Incorporation, the hospital's Department of Pastoral Care has retained a critical aspect of that religious identity in order to provide religious services to its patients. These services, while not limited to those who are Methodist, are indisputably religious.[4] Mr. Penn *426 himself acknowledges as much. See Penn , 2013 WL 5477600, at *6 (alluding to Mr. Penn's Complaint, in which he states that he coordinated the distribution of Bibles to all patient units, performed an in-hospital memorial service for an employee who died, performed Easter Services and communion and "maintain[ed] an active, on-going Pastoral care to staff").
In its ruling on summary judgment, the district court determined that "the relationship between Plaintiff and NYMH (specifically, the Department of Pastoral Care) was that of a religious employee and a religious institution." Penn , 158 F.Supp.3d at 184 (limiting its decision by noting that it was made "insofar as Plaintiff is a Methodist and was responsible-at least in part-for preaching the Christian faith"). While Mr. Penn challenges whether the "obvious religious characteristics" of his work and the NYMH satisfy the legal standard of being a "religious group," he does not and cannot dispute that he performed religious services for NYMH's Department of Pastoral Care and, thus, served that department's religious purpose. The district court therefore properly applied the ministerial exception because the Department of Pastoral Care within the NYMH had the "obvious religious characteristics" of a "religious group" and employed Mr. Penn as a minister.[5]
B. This Application of the Ministerial Exception Doctrine Properly Recognizes the Establishment Clause's Prohibition Against Excessive Entanglement With Religion
This application of the ministerial exception doctrine, that the NYMH's Department of Pastoral Care is a "religious group," one consistent with the relevant precedent and this case's undisputed facts, properly balances the constitutional consequences of not doing so: the risk of excessive entanglement with "ecclesiastical decisions." Hosanna-Tabor , 565 U.S. at 188-89, 132 S.Ct. 694 (observing that judicial interference with the selection of ministers violates the Establishment Clause, which "prohibits government involvement in ... ecclesiastical decisions" to protect against the establishment of religion).
*427 As this Court has recognized, " Hosanna-Tabor made clear that the First Amendment does not tolerate a judicial remedy for any minister claiming employment discrimination against his or her religious group, regardless of the group's asserted reason (if any) for the adverse employment action." Fratello , 863 F.3d at 204. This Court explained that "a court is virtually never the place[ ] to analyze the grounds for a religious group's reasons for selecting its ministers," id . at 204 n.26, because a judge is ill-equipped even to assess whether a particular claim is a religious one. It is clear, therefore, that the purpose of the exception is "not to safeguard a church's decision to fire a minister only when it is made for a religious reason," but rather to protect a church's autonomy to "select[ ] those who will personify its beliefs." Hosanna-Tabor , 565 U.S. at 188-89, 132 S.Ct. 694. In other words, rather than focus on the claims at issue in an employment discrimination case, Hosanna-Tabor instructs us to review the employee and the employer and assess the religious characteristics of each.
Our inquiry therefore must consider the Establishment Clause, which forbids "an excessive government entanglement with religion." Lemon v. Kurtzman , 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (citation omitted); see also Scharon , 929 F.2d at 362 ("To decide this question, we apply another three-part test set out by the Supreme Court in Lemon .... Scharon argues that St. Luke's is not a religious institution and that she was a secular employee, not 'clergy.' She therefore claims that the application of Title VII and the ADEA would not require excessive government entanglement with religion. Scharon's assertions, however, are untenable."). While Hosanna-Tabor did "leave open the possibility that some employment-discrimination claims by ministers might not be barred if excessive entanglement could be avoided in the particular case," Fratello , 863 F.3d at 202, where excessive government entanglement with religion is involved, it follows that employment discrimination claims by ministers must be barred.
Indeed, this Court in Rweyemamu clarified the important constitutional issues behind the ministerial exception doctrine. There, a Catholic priest filed suit against the local Bishop and Diocese, alleging employment discrimination in violation of Title VII. The Court observed that a "lay employee's relationship to his employer may be 'so pervasively religious' that judicial interference in the form of a discrimination inquiry could run afoul of the Constitution." Rweyemamu , 520 F.3d at 208 (citing DeMarco v. Holy Cross High Sch. , 4 F.3d 166 (2d Cir. 1993) ). In order to prevail on his Title VII claim, the priest had to argue that the Catholic Church's decision to fire him was "not only erroneous, but also pretextual." Id. The ministerial exception applied because the Court was neither permitted nor equipped to evaluate Rweyemamu's pretext argument. Id.
As the Court noted: "[H]ow are we, as Article III judges, to gainsay the Congregatio Pro Clericis' conclusion that [Rweyemamu] is insufficiently devoted to ministry? How are we to assess the quality of his homilies?" Id. at 209 ; see Bronx Household of Faith v. Bd. of Educ. of N.Y.C. , 750 F.3d 184, 199 (2d Cir. 2014) ("[A]t the very least ... the Establishment Clause prohibits government from appearing to take a position on questions of religious belief.") (citations omitted); see also Commack , 294 F.3d at 425 (holding that the challenged kosher fraud laws "excessively entangle government and religion because they ... take sides in a religious matter [and] require *428 the State to take an official position on religious doctrine.").[6]
This case presents that precise challenge. Any evaluation of Mr. Penn's claims would require the Court to examine whether NYMH's explanation of its failure to promote him, and for his eventual termination, was "not only erroneous, but also pre-textual." Rweyemamu , 520 F.3d at 209. As "legitimate non-discriminatory reasons" for their failure to promote Mr. Penn, NYMH argues that Mr. Penn ended a service with a hymn that was only familiar to a certain group of Christians, spent too much time counseling each patient, was insensitive to non-Christian patients, and failed to attend meetings. When Mr. Poulos selected Ms. Hong over Mr. Penn for promotion to Staff Chaplain, Mr. Poulos concluded that Ms. Hong had "strong[er] counseling skills" and was, in short, a better pastor. Joint App'x at 174. To explain its decision to fire Mr. Penn-the decision that he challenges as retaliatory-NYMH claims that Mr. Penn improperly completed a "referral card," which resulted in a patient dying without receiving last rites, inappropriately counseled a couple after a fetal demise, misrepresented the availability of an Easter Service to a Catholic nurse, and triggered complaints about sexual harassment from a Resident Chaplain.
Any jury hearing Mr. Penn's employment discrimination and retaliation claims therefore would have to determine how a minister should conduct religious services or provide spiritual support. Jurors would have to measure the importance of a patient's last rites, a chaplain's selection of a particular hymn, and a Catholic's access to Communion. They would need to evaluate whether it was appropriate for the Department of Pastoral Care to seek out a Catholic chaplain or to fire an employee who did not accommodate Catholic nurses. They would have to consider the disagreement between Mr. Poulos and Mr. Penn on the appropriate length of pastoral counseling sessions-a "philosophical difference," according to NYMH-and compare Mr. Penn's pastoral skills to Ms. Hong's. Appellee's Br. at 37.
Any of these decisions, all indisputably necessary to the adjudication of Mr. Penn's claims-even if intertwined with some secular concerns-"would plunge [the Court] into a maelstrom of Church policy, administration, and governance," Rweyemamu , 520 F.3d at 209 (citing Natal v. Christian and Missionary Alliance , 878 F.2d 1575, 1578 (1st Cir. 1989) (internal quotation marks omitted), and risk "government involvement in ... ecclesiastical decisions." Hosanna-Tabor , 565 U.S. at 171, 132 S.Ct. 694.[7] This Court has cautioned *429 that judges are "ill-equipped to assess whether, and to what extent, an employment dispute between a minister and his or her religious group is premised on religious grounds." Fratello , 863 F.3d at 203. And, when a court is asked to "take sides in a religious matter," Commack , 294 F.3d at 425, the court must dismiss the case. See Culvert , 753 F.2d at 1168 (recognizing that "the First Amendment prohibits ... [the courts] from inquiring into an asserted religious motive to determine whether it is pretextual."). Following these principles, this case must be dismissed.
IV. CONCLUSION
For the reasons stated above, the judgment of the district court is AFFIRMED.

There are two chaplain roles-Duty Chaplain and Staff Chaplain-in the Department of Pastoral Education at NYMH. According to Defendants, Duty Chaplains "primarily ... respond[ ] to pages". Joint App'x at 172. Staff Chaplains, on the other hand, "affirmatively contact new patients on the floor, and take the initiative to make sure all patients in their units are aware of the Department and the services it provides."Id . Mr. Penn held the role of both Staff Chaplain and Duty Chaplain at various points. See Joint App'x at 252.

Appellant also argued that the district court erred by (1) admitting an unauthenticated copy of NYMH's by-laws into evidence, Appellant's Br. at 58; (2) failing to consider caselaw interpreting the Religious Freedom Restoration Act (RFRA) and Title VII's exemption for "religiously affiliated" employers, id. at 28; and (3) considering the "sliding scale" test referenced in Musante , 2004 WL 721774, at *6, and Rweyemamu , 520 F.3d at 208. We do not need to reach these issues. Nor do we need to address Appellee's argument that RFRA separately bars this case.

The dissent reaches the opposite conclusion. See Dissent at 436 ("Because there is insufficient evidence that NYMH's mission is marked by clear or obvious religious characteristic, I conclude that it does not qualify as a religious institution for purposes of the ministerial exception." (citation and internal quotation marks omitted) ). Paradoxically, although the NYMH's Department of Pastoral Care indisputably is dedicated to the religious concerns of the hospital's patients by providing and supervising chaplains to address their specific religious needs, the dissent would hold that it is not a "religious group." As discussed below, this outcome is neither required nor recommended by the prevailing law.

The dissent does not argue that the Department of Pastoral Care is not engaged in legitimate religious activities, but instead disregards these religious activities because they are not "Methodist." See Dissent at 433 (noting, inter alia , that its mission statement "is 'ecumenical,' i.e., not Methodist;" its "website does not mention the Methodist faith;" and "[n]one of the three full-time chaplains of the Hospital's Department of Pastoral Care are Methodist;" and expecting "its director to be Methodist, or for at least one of its permanent chaplains to be Methodist ...."). As a result, the dissent finds that "NYMH's mission and operations are not 'marked by clear or obvious religious characteristics.' " Id. at 433 (quoting Shaliehsabou , 363 F.3d at 310 ). The dissent, however, cites no precedent for the proposition that the Department of Pastoral Care's embrace of religious traditions beyond Methodism disqualifies it from constitutional protection under the Constitution's Religion Clauses, and to inquire whether this ecumenical approach to pastoral care is consistent with Methodism, simply "plunge[s the Court] into a maelstrom of Church policy, administration, and governance," Rweyemamu , 520 F.3d at 209 (citation and internal quotation marks omitted), something this Court has expressly prohibited. See id. at 209-10 ; see also Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d 415, 427 (2d Cir. 2002) ; Catholic High Sch. Ass'n of the Archdiocese v. Culvert , 753 F.2d 1161, 1168 (2d Cir. 1985).

Because this Court's ruling is premised on the NYMH having been a religiously-affiliated entity and having retained a sufficient portion of its identity in the specific operation of the Department of Pastoral Care, this Court does not and need not reach the issue of whether hospitals, secular in their origins and with chaplaincies, also could properly invoke the ministerial exception. "There will be time enough to address the applicability of the exception to other circumstances if and when they arise." Hosanna-Tabor , 565 U.S. at 196, 132 S.Ct. 694 ; see also PDK Laboratories Inc. v. U.S. Drug Enforcement Admin. , 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (noting the "cardinal principle of judicial restraint - if it is not necessary to decide more, it is necessary not to decide more ...").

Even before Rweyemamu , this Court had recognized that courts are prohibited "from inquiring into an asserted religious motive to determine whether it is pretextual." Culvert , 753 F.2d at 1168.

The dissent argues that "the interfaith nature of the Department means that it is not run according to the tenets of any particular religion, thereby reducing the likelihood that evaluating the reasons for the termination of an employee such as Penn would 'plunge [a court] into a maelstrom of Church policy, administration, and governance." Dissent at 436 (quoting Rweyemamu , 520 F.3d at 209 ). In doing so, the dissent glosses over core Establishment Clause issues in two significant ways. First, as discussed above, see Op. at 425-26 n.4, by determining that the NYMH's Department of Pastoral Care's ecumenical approach to pastoral care is inconsistent with Methodism, the dissent has already crossed the permissible constitutional line and begun defining "Church policy, administration, and governance." Second, because the Department of Pastoral Care serves the diverse spiritual needs of its patients, it thus must be cognizant of and sensitive to "Church policy, administration, and governance" of many faith perspectives and not just one. If not, it risks trivializing, if not disrespecting, the genuine religious beliefs of its patients. See Joint App'x at 407 (requiring NYMH chaplains "[t]o facilitate the patient's receiving the rituals and practices of his/her own faith traditions when requested"). In other words, "the interfaith nature of the Department" means more entanglement with "Church policy, administration, and governance,"-not less.