SUPERIOR COURT 
 
 MARGARET DEWEESE-BOYD vs. GORDON COLLEGE & others[1]

 
 Docket:
 1777CV01367
 
 
 Dates:
 April 2, 2020
 
 
 Present:
 /s/Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE FIRST AMENDMENT MINISTERIAL EXCEPTION (PAPER NO. 33) AND PLAINTIFF'S CROSS-MOTION ON THE FIRST AMENDMENT MINISTERIAL EXCEPTION (PAPER NO. 33.2)
 
 

             The "ministerial exception" is an affirmative defense grounded in the Religious Clauses of the First Amendment that precludes government interference with employment relationships between religious institutions and their ministerial employees.
            Before the Court are cross-motions for summary judgment which ask the Court to determine whether the ministerial exception applies in this case to prohibit employment discrimination and other claims brought by a former professor of social-work against her former employer, a religious liberal arts college.
            More specifically, plaintiff Margaret DeWeese-Boyd ("DeWeese-Boyd") claims defendants Gordon College ("Gordon" or "College"), its president, D. Michael Lindsay ("Lindsay"), and its provost, Janel Curry ("Curry") (collectively, "Gordon Defendants") discriminated against her after she vocally and publicly opposed Gordon College's alleged discriminatory policies relating to "LGBTQ+ individuals" by denying her application for promotion to full professor in February 2017, despite she received the
---------------------------
[1] D. Michael Lindsay and Jane! Curry.
                                                            Page 1 of 54
unanimous recommendation of the Faculty Senate. See Complaint And Jury Demand (Paper No. 1) ("Complaint"), ¶1.
            In the Complaint, DeWeese-Boyd asserts claims against the Gordon Defendants for retaliation in violation of G.L. c. 151B, § 9 (Count I); associational and gender discrimination in violation of G.L. c. 151B, § 4 (Count II); violation of the Massachusetts Civil Rights Act ("MCRA") at G.L. c. 12, §§ 11H and 111 (Count IV); breach of contract (Count VI); and, breach of the implied covenant of good faith and fair dealing (Count VII). In addition, DeWeese-Boyd asserts claims against Lindsay and Curry, individually, for aiding, abetting and interference with her civil rights in violation of G.L. c. 151B, § 4 (Count III), and tortious interference with contractual and/or advantageous relations (Count V).
            On November 7, 2019, the parties were before the Court for a hearing on Defendants' Motion For Summary Judgment On The First Amendment Ministerial Exception (Paper No. 33) ("Defendants' Motion") and Plaintiffs Cross-Motion On The First Amendment Ministerial Exception (Paper No. 33.2) ("Plaintiff's Cross-Motion"). On summary judgment, the Gordon Defendants assert, and DeWeese-Boyd denies, that the ministerial exception applies to prohibit all of DeWeese-Boyd's claims.
            For the reasons stated below, the Court concludes that, in the circumstances of this case, the ministerial exception does not apply. Therefore, Defendants' Motion is DENIED and Plaintiffs Cross-Motion is ALLOWED.
                                                            Page 2 of 54
PROCEDURAL HISTORY
            On August 2, 2018, the Court (Tabit, J.) issued a Memorandum and Order (Paper No. 17) bifurcating discovery so that the first phase of discovery pertained solely to the ministerial exception the Gordon Defendants raise as an affirmative defense. The parties brought the cross-motions for summary judgment now before the Court at the close of the first phase of discovery solely on the issue of whether the ministerial exception applies.
            On November 6, 2019, this Court (i.e., the undersigned judge), sua sponte, struck the Consolidated Statement Of Undisputed Material Facts (Paper No. 33.5) because the parties failed to comply with Mass. Super. Ct. R. 9A(b)(5), and ordered the parties to file an amended statement of facts.[2] See Order at Paper No. 34.
            On December 6, 2019, the parties filed an Amended Consolidated Statement Of Undisputed Material Facts (Paper No. 36) ("Amended Statement Of Facts")[3] and the following: (a) Amended Memorandum In Support Of Defendants' Motion For Summary Judgment On The First Amendment Ministerial Exception (Paper No. 37); (b) Defendants' Amended Opposition To Plaintiff's Cross-Motion For Summary Judgment On The First Amendment Ministerial Exception (Paper No. 38); (c) Plaintiff's Amended Opposition To Defendants' Motion For Summary Judgment And Plaintiffs Cross-Motion
---------------------------
[2] In addition to its failure to comply with Rule 9A, the Consolidated Statement Of Undisputed Facts (Paper No. 33.5) ("SOF") contained more than 200 statements of fact, was 79 pages in length, and was argumentative and prolix. See Order at Paper No. 34.
[3] Although the Amended Statement Of Facts reduced the length and violations of Rule 9A(b)(5), unfortunately, the Gordon Defendants continued to violate the spirit and letter of Rule 9A(b)(5) when responding to the plaintiffs statement of additional facts. See, e.g., the Gordon Defendants' responses to the Plaintiffs Statement of Additional Facts at Nos. 24, 30, 31, 35, 38, 39, 41, 44 — 46, 52, 98, 106, 118, 128, etc. Nevertheless, the Court considered the responses.
                                                            Page 3 of 54
On The First Amendment Ministerial Exception And Memorandum In Support (Paper No. 39); and, (d) Plaintiffs Amended Reply Brief In Support Of Plaintiffs Cross-Motion On The First Amendment Ministerial Exception (Paper No. 40).
            In resolving the pending cross-motions for summary judgment, the Court has relied on the oral arguments of counsel at the hearing, the parties' Joint Exhibits Appendix For Summary Judgment (Paper No. 33.6) ("J.A."), the Amended Statement Of Facts, and the aforementioned amended memoranda of law.[4]
BACKGROUND
            The following facts are taken from the Amended Statement Of Facts and the summary judgment record.[5]
A. Gordon College 
            Founded in 1889, Gordon College is an evangelical Christian undergraduate and graduate college. Its campus is located in Wenham, Massachusetts. The campus has two chapels set aside for prayer and meditation. Religious art, Christian artifacts, and Bible verses are displayed, and Christian music is played, throughout the campus.
---------------------------
[4] In its amended memorandum of law in support of Defendants' Motion, the Gordon Defendants "incorporate by reference the materials, arguments, and cases cited in the memoranda in support of their Motion for Judgment on the Pleadings." (Paper No. 37, p. 15 n.2). However, the Court has not considered the Gordon Defendants' Motion for Judgment on the Pleadings when deciding the cross-motions for summary judgment because the Court granted the parties leave to file memoranda in excess of the twenty-page limit required by Mass. Super. Ct. R. 9A(a)(5)(iv). To be sure, the Gordon Defendants' amended memoranda span 51 pages, their amended statement of facts cover 18 pages, and the Joint Appendix is hundreds of pages. At bottom, the Court granted the parties sufficient opportunity to present their arguments at this stage of the proceedings.
[5] Additional relevant facts are discussed, infra, in the Court's Discussion section.
                                                            Page 4 of 54
            The Commonwealth chartered Gordon to carry on the educational work begun in 1889 by the Reverend Gordon.[6] According to its formal Mission Statement, "Gordon College strives to graduate men and women distinguished by intellectual maturity and Christian character, committed to lives of services and prepared for leadership worldwide." J.A., Ex. 1, Preamble, p. 3; Ex. 4, Section 1.3, p. 5.
            Gordon filed Restated Articles Of Organization with the Commonwealth on June 24, 1988. The Restated Articles state Gordon was formed "to provide a college education in the liberal arts and sciences to qualified persons; to provide training for the professions; to provide instruction in the Bible and other subjects; [and,] to prepare men and women for the work of foreign and home missions, for the duties of the Christian ministry and other special forms of Christian work[.]" J.A., Ex. 2, p. 1.[7]
            Similarly, Gordon's Bylaws, as amended on September 24, 2010, state, among other things, Gordon is "dedicated" to the following: "The historic, evangelical, biblical faith"; "[e]ducation, not indoctrination"; "[s]cholarship that is integrally Christian"; "[p]eople and programs that reflect the rich mosaic of the Body of Christ"; "[I]ife guided by the teaching of Christ and the empowerment of the Holy Spirit"; "[t]he maturation of students in all dimensions of life: body, mind, and spirit"; and, "[t]he application of biblical principles to transform society and culture." J.A., Ex. 1, p. 3.
---------------------------
[6] In 1970, Gordon's divinity school, which is located in South Hamilton, MA, became a separate entity, Gordon-Conwell Theological Seminary. J.A., Ex. 4, p. 5, Art. 1.2.
[7] In its annual nonprofit disclosure form filed with the Massachusetts Attorney General's Office for the fiscal year ending June 30, 2017, when given the choice, Gordon selected a description of its purpose as "[Nigher education," rather than "Neligious." J.A., Ex. 33, p. 1. In addition, on the same disclosure, Gordon did not claim it was a religious organization and, thus, exempt from having to file a solicitation of contributions certificate. J.A., Ex. 33, p. 4.
                                                            Page 5 of 54
            Gordon's Mission Statement[8] reflects these purposes, stating, in part:
As an intentional Christian community, Gordon serves students from a wide range of backgrounds who embrace the College's broadly evangelical identity and desire an experience that combines an exceptional liberal arts education with an informed Christian faith.. .. Gordon also remains committed to the power of a liberal arts education to hone qualities most sought by employers—the ability to think holistically, reason analytically, communicate persuasively and—even more importantly—to act morally. Our primary responsibility is to prepare students for the long haul, to make them spiritually, intellectually, relationally and professionally ready for a lifetime of growth—from the first job out of college and beyond, into fields not yet existing . . . . Our mission is the foundation of all we do as we inspire the next generation toward faithful leadership for the common good.
J.A., Ex. 27.
            In keeping with Gordon's mission, undergraduate student applicants must "have a profession of Christian faith . . . [and] they have to be able to talk about that [profession] in the admissions interview." J.A., Ex. 7, pp. 15-16. Further, all Gordon undergraduate students are required to complete the College's "Core Curriculum," which "explores the liberal arts and sciences from a Christian perspective." J.A., Ex. 9, p. 1 (emphasis added). The purpose of the Core Curriculum is to, among other things, "foster [k]nowledge of God's character as revealed in Scripture and understood in the Church." J.A., Ex. 9. Mandatory classes include Old Testament History, Literature and Theology; New Testament History, Literature and Theology; and, Christian Theology.[9] J.A., Ex. 9. Gordon's curriculum also mandates "Christian Life and Worship" credits that
---------------------------
[8] This Mission Statement is different from the aforementioned mission statement in the Bylaws and appears to come from Gordon's website. See J.A., Ex. 27.
[9] The Core Curriculum also includes numerous non-religious requirements including foreign language, and physical and outdoor education. J.A., Ex. 9.
                                                            Page 6 of 54
students can fulfill by attending chapel services or other faith-based events on campus. J.A., Ex. 7, pp. 38-39.
            B. The Faculty Handbook 
            The Gordon College Administrative/Faculty Handbook ("Faculty Handbook") refers to Gordon "[a]s a Christian community of learners." J.A., Ex. 4, p. 5. The Faculty Handbook also contains various provisions about Gordon's perceptions of the role of faculty members and its expectations about their approach to work at Gordon. For example, the Faculty Handbook states "Gordon College approaches its educational task from within the fixed reference points of biblical theism, which provides a coherent perspective on life and the world." J.A., Ex. 4, p. 6 (emphasis added). Further, the Faculty Handbook states Gordon's "community" is "challenged" to, among other things, assist its students to "[p]ursue truth as revealed by God in Christ, Scripture and Creation"; "[d]evelop a Christian worldview as a basis for both informed reflection and a reformation of culture"; "[b]egin a journey of lifelong, faith-directed learning"; "Nespect the heritage of the Church and serve the Body of Christ with commitment, fidelity, and self-sacrifice"; and, "[a]cquire a sense of vocation and calling before God[.]" J.A., Ex. 4, p. 6.
            According to the Faculty Handbook, the foundations of Gordon's education philosophy are Christian doctrine, such as an acknowledgement that "God reveals Himself through His created order, Scriptures," and a recognition "that God's eternal Word is the ultimate source and foundation of all truth." J.A., Ex. 4, Section 1.5, pp. 6-7.
            In addition, according to the Faculty Handbook, faculty members "are expected to be fully prepared in all facets of their tasks as Christian teachers and advisors, both
                                                            Page 7 of 54
inside and outside the classroom," and "[t]hey are expected to strive to engage students in their respective disciplines from the perspectives of the Christian faith and to teach with accuracy and integrity." J.A., Ex. 4, p. 38. Moreover, the Faculty Handbook provides that "each member of faculty is expected to participate actively in the spiritual formation of [Gordon's] students into godly biblically-faithful ambassadors for Christ[,]" and that, "[in the Gordon College context, faculty members are both educators and ministers to our students."[10] J.A., Ex. 4, p. 64 (emphasis added).
            Finally, the Faculty Handbook states that "[a]mong the tasks of the Christian educator, none is more important than that which seeks the integration of faith, learning, and living." J.A., Ex. 4, p. 4. Moreover, it states "integration" of faith and learning includes a professor's assistance in helping students make connections between course content, Christian thought and principles, and personal faith and practice. J.A., Ex. 4, pp. 65-66. This principle of integration means "[t]he faculty of Gordon College is a community of Christians, committed to imaging Christ in all aspects of their educational endeavors." J.A., Ex. 4, p. 64. Moreover, during DeWeese-Boyd's employment, Gordon conducted seminars for professors about the integration of the Christian faith and learning.
---------------------------
[10] There is no dispute the Faculty Handbook states that faculty are expected to be "both educators and ministers" (emphasis added). However, DeWeese-Boyd contends that this latter phrase (i.e., "and ministers") was added in 2016 to give more heft to Gordon's assertion of the ministerial exception defense, and that there was significant faculty opposition to adding the phrase.
                                                            Page 8 of 54
            C. Applying To, And Working For, Gordon College 
            Gordon does not require that its professors have any specific formal religious training prior to starting their employment. J.A., Ex. 29, ¶17. Thus, a seminary degree is not a condition to becoming a professor at Gordon College.[11] J.A., Ex. 34, p. 60. However, when applying to work at Gordon College, all faculty, administrators, and trustees must sign a "Memorandum Of Understanding," in which they agree to "support the goals and objectives of Gordon College as a distinctively Christian Institution of higher learning"; "acknowledge personal agreement with the Statement of Faith"; and, "agree to abide by" the standards set forth in "the [Sjtatement of 'Life and Conduct at Gordon College[.]" J.A., Ex. 5.
            In turn, the Statement of Faith,[12] with which faculty members must agree, provides, inter alia, that: (1) "[t]he 66 canonical books of the Bible as originally written were inspired by God"; (2) "Where is one God, the Creator and Preserver of all things, infinite in being and perfection"; (3) "humankind can be saved only by the grace of God"; (4) "it is the responsibility of the believer to contribute by word and deed to the universal spread of the gospel"; and (5) "[a]t the end of the age the bodies of the dead shall be raised[,] . . . [t]he righteous shall enter into full possession of eternal bliss[,] . . . [and] the wicked shall be condemned to eternal death." J.A., Ex. 6.
---------------------------
[11] Although Gordon does not require its professors to have seminary degrees, many do, including DeWeese-Boyd. J.A., Ex. 62, Answer No. 18.
[12] The Statement of Faith is set forth in Section 1.6 of the Faculty Handbook.
                                                            Page 9 of 54
            Similarly, the Statement of Life and Conduct,[13] with which faculty members must agree to obey, states "Gordon College strives to maintain its identity as a Christian academic community of students, faculty, and staff." It further states Gordon "expects" all members of the college community, including the faculty, to "[c]all themselves Christian by virtue of the grace of God and their personal commitment to Jesus Christ"; "Necognize the Bible to be the Word of God and hence fully authoritative in matters of faith and conduct"; and, "[Nave a sincere desire for that commitment to mature both in insight and behavior." J.A., Ex. 6.
            In addition, the Statement of Life and Conduct provides that individuals who join Gordon's community must, inter alia, "[u]nderstand that they have become part of an evangelical Christian tradition which is to be respected and valued"; "[s]trive to exemplify those positive elements of Christian behavior which are taught in Scripture"; and, "[a]ssume responsibility for their own behavior as it reflects upon their Lord, their community and themselves, particularly in the area of personal freedom, where discretion, moderation and restraint must be practiced." J.A., Ex. 6. The Statement of Life and Conduct also sets forth certain faith-based "Behavioral Standards," with which all students, faculty, and staff agree to comply, such as refraining from "words and actions which are expressly forbidden in Scripture." J.A., Ex. 6.
            President Lindsay testified that all Gordon employees must be "committed to the evangelical mission of the institution[,]" and that "journeys of faith are evaluated ... when employees are hired" and "through the performance review process." J.A., Ex. 7,
---------------------------
[13] The Statement of Life and Conduct is set forth in Section 1.7 of the Faculty Handbook. In addition to faculty members, all students agree to abide by the Statement of Faith and the Statement of Life and Conduct. J.A., Ex. 8, p. 3.
                                                            Page 10 of 54
p. 18. He testified further that, when he interviews faculty applicants, he emphasizes "the importance of taking seriously signing the Statement of Faith and the Statement of Life and Conduct and being able to embrace the Christian mission and purpose of the institution." J.A., Ex. 7, p. 42. President Lindsay also testified that he "liken[s] joining Gordon College to joining a religious order."[14] J.A., Ex. 7, p. 42.
            D. DeWeese-Boyd's Hiring And Retention By Gordon College 
            Prior to joining Gordon, DeWeese-Boyd received a master's degree in General Theological Studies from Covenant Theological Seminary in St. Louis. J.A., Ex. 12. She performed mission work in the Philippines in addition to her seminary training.
            DeWeese-Boyd first contacted Gordon about a tenure-track faculty position in its social work department on February 25, 1998. She sent a cover letter to Gordon's then-Provost in which she stated, "[a]s a product of a Christian liberal arts college . . . I very much want to participate in, and contribute to, Christian liberal arts education." J.A, Ex. 12. She further stated that her seminary training and mission work in the Philippines "could be of particular benefit to Gordon College Students." J.A., Ex. 12.
            On March 9, 1998, DeWeese-Boyd submitted an application for employment to Gordon in which she acknowledged her personal agreement with the Statement of Faith, agreed to comply with the Statement of Life and Conduct, described her Christian belief and her pilgrimage as a Christian, and explained how her Christian commitment affected her scholarship. J.A., Ex. 15. In the application, DeWeese-Boyd was asked her understanding of the basic responsibilities of a faculty member in an institution of Christian higher education, to which DeWeese-Boyd stated "to provide a critical, and
---------------------------
[14] Lindsay was not the president of Gordon College in 1998 when DeWeese-Boyd was hired.
                                                            Page 11 of 54
distinctly Christian, perspective[,] . . . to guide and mentor each student in such a way as to help her discern how Christianity impacts upon her particular discipline[,] . . . [and] to teach her students how to do 'Christian scholarship.'"[15] J.A., Ex. 15.
            In a letter dated June 9, 1998, Gordon College offered DeWeese-Boyd a "tenure track faculty position." J.A., Ex. 16. This letter stated, "Your achievements, academic pedigree, commitment to the Triune God, and expressed desire to benevolently serve in this Christian liberal arts setting have led to your appointment to the faculty." J.A., Ex. 16. In closing, the letter stated, "Welcome to Gordon College faculty. May the Lord always bless your work here as you join us in the 'precious trust' of developing young Christian hearts, hands, and minds." J.A., Ex. 16.
            Gordon specifically hired DeWeese-Boyd as an Assistant Professor to work in Gordon's Social Work Department. She began teaching in fall 1999.
            In 2004, Gordon promoted DeWeese-Boyd to Associate Professor and Gordon approved her for tenure in September 2009. J.A., Ex. 29.
            After her promotion in 2004, DeWeese-Boyd's formal title was Associate Professor of Social Work, with tenure. J.A., Ex. 37. She avers she never held herself out as a minister inside or outside Gordon, and she never regarded herself as a minister. WA., Ex. 29, ¶¶19 - 20.
---------------------------
[15] There appears to be no dispute that applicants for faculty positions are required to sign the Memorandum of Understanding discussed above. See SOF, ¶12. However, the record is unclear regarding whether DeWeese-Boyd signed it. Nevertheless, there is no dispute that in signing her application for employment, DeWeese-Boyd acknowledged her personal agreement with the Statement of Faith and agreed to comply with the Statement of Life and Conduct, two things memorialized in the Memorandum of Understanding. See J.A., Ex. 15, p. 2.
                                                            Page 12 of 54
            E. The Social Work Department
            The Gordon College Social Work Program Student Handbook ("Social Work Handbook") states the program "prepares graduates for beginning level generalist social work practice and for graduate study in social work." J.A., Ex. 21, p. 78. In addition, the Social Work Handbook provides that the College's social work program is "informed by a Christian worldview which affirms the value and dignity of every person[,]" and requires "Christians to strive for the enhancement of human well-being, the alleviation of poverty and oppression, and the healing of the whole person and the whole society." J.A., Ex. 21, p.79.
            The goals of the Social Work Program include the integration of social work and Christian values, and the program's competencies are "designed," at least in part, to reflect this goal. J.A., Ex. 21, pp. 79-80. Moreover, the program's "supporting intentions" include, inter alia, "[p]reparing graduates to integrate Christian and social work values in their practice of social work[,] . . [p]reparing graduates for graduate study in social work, related disciplines, or Christian ministry[,] [and] [p]reparing graduates for service in other social service fields, including Christian ministry." J.A., Ex. 21, p. 81.
            F. Promotion & Integration Of Faith And Teaching 
            As stated, Gordon expects its faculty members to integrate the Christian faith into their teaching. The significance of "integration" in Gordon's mission is illustrated by its prominence in the Faculty Handbook and the Statement of Faith. In summarizing how the faculty practices "integration," Lindsay testified that "[i]n their teaching, they are expected to profess — and that's the professor — to profess the Christian faith; to assist students in their spiritual journey as part of their intellectual formation; to be available to
                                                            Page 13 of 54
minister to students with questions, personal needs, spiritual exploration; . . . ; [and,] to inculcate the Christian identity and to transmit it to the next generation." J.A., Ex. 14, p. 43. According to Lindsay, "all professors [are] expected to profess the Christian faith. It is the purpose of the institution." Id. at p. 55.
            As faculty members progress through the promotion and tenure application processes at Gordon, they are required to describe in detail how they integrate faith and teaching.[16] In 2002, DeWeese-Boyd submitted her first integration paper to Gordon. J.A., Ex. 18. In the cover letter accompanying this paper, she stated, "I understand my work to be inherently integrated because the topics and issues that I choose to spend time researching, thinking about, and writing on are topics and issues that I understand to be fundamental to the call of Christian life and action in the world." J.A., Ex. 18, p. 4.
            In 2009, Gordon approved DeWeese-Boyd for tenure. As part of her application for tenure, DeWeese-Boyd submitted a paper entitled "Reflections on Christian Scholarship." J.A., Ex. 19. Therein, DeWeese-Boyd made various statements about what she understood integration to mean and how she integrated the Christian faith into her teaching, including the following:
            •           "I understand the work of integration to be fundamentally about . . . pursuing scholarship that is faithful to the mandates of Scripture" and "the vocational call of Christ[.]" J.A., Ex. 19, p. 1.
---------------------------
[16] In the summary judgment record, Gordon submitted student feedback regarding DeWeeseBoyd's integration of faith and teaching. This came in the form of Course & Faculty Evaluation Forms ("Forms") in which students claimed DeWeese-Boyd "did a great job" of integrating faith and teaching. See J.A., Ex. 23. DeWeese-Boyd objects on hearsay grounds to the Court considering the Forms. The Court overrules the objection because the Forms qualify as business records. However, the Forms are not helpful to the Court's consideration of whether the ministerial exception applies because there is little dispute that DeWeese-Boyd's responsibilities included integrating faith and teaching, and her performance in doing so is irrelevant at this stage of the proceedings.
                                                            Page 14 of 54
            •           "My approach to Christian scholarship—indeed, my choice of disciplinary field as well as my scholarly interest and pursuits within that field—are shaped by the Scriptural mandate to pursue shalom." J.A., Ex. 19, p. 5.
            •           "In my vocation as [a] Christian Scholar, I strive to make useful contributions to the body of knowledge in my area of expertise—contributions informed by a uniquely Christian perspective, as well as one with practical applications for human society." J.A., Ex. 19, p. 8.
            •           "My Christian commitment also affects my scholarship by allowing me to see my work as participation in the ministry of Christian reconciliation." J.A., Ex. 19, p. 8.
            •           "[I]n my role as Christian educator, a desire to follow Christ impacts my work in several ways. First and foremost it informs the choice of disciplinary field in which I teach, as discussed previously. Secondly, it plays out in the methods with which I teach, and how I interact with students." J.A., Ex. 19, p. 9.
            •           "In sum, I believe it is our understanding of mandates of Scripture, our understanding of vocation, as well as the dictates of our own consciences, that help shape how we come to view—and take up—our individual roles in furthering in (sic) the Kingdom of God as Christian scholars and educators." J.A., Ex. 19, p. 10.
            In 2016, DeWeese-Boyd submitted an application for promotion to Full Professor. J.A., Ex. 20. In the "Introduction" section of the application, she stated, "my desire to follow Christ informs my chosen field of study, my approach to teaching, the topics I engage as a scholar, and my approach to institutional service." J.A., Ex. 20, p. 1. Further, DeWeese-Boyd stated, "[t]hroughout my life, I have sought to cultivate a living and active faith in Jesus Christ—one that informs all of my personal and professional endeavors." J.A., Ex. 20, p. 1. Moreover, in the application under the heading "Scholarship/Professional Development," DeWeese-Boyd stated, "God calls us throughout Scripture to struggle against flawed social, political and economic structures . . . For my part, this means taking up scholarly questions that have moral and ethical significance beyond their academic merits." J.A., Ex. 20, p. 9.
                                                            Page 15 of 54
            During her employment at Gordon, DeWeese-Boyd attended religious services, convocations, and religious gatherings with students at the Gordon chapel.[17] SOF, ¶64. She also attended a local church at which Gordon students sometimes attended. SOF, ¶65.
            G. Gordon College Denial Of DeWeese-Boyd's Promotion To Full Professor
            According to the Faculty Handbook, "[t]he Faculty Senate and the provost are responsible for coordinating faculty evaluation efforts." J.A., Ex. 4, p. 43. The Faculty Senate is responsible for making recommendations on professors' applications for tenure and promotions. J.A., Ex. 4, pp. 39, 41-42.
            On December 15, 2016, the Faculty Senate informed DeWeese-Boyd in writing that it unanimously recommended her to Provost Curry for promotion to full professor. The Faculty Senate "found [her] to be meritorious in teaching and institutional service and [her] scholarship was assessed at the expected level." J.A. Ex. 45, p. 1.
            Notwithstanding the recommendation from the Faculty Senate, in a letter dated February 8, 2017, Provost Curry declined to recommend DeWeese-Boyd for promotion to President Lindsay and the Board of Trustees. J.A., Ex. 46. Lindsay "concurred with [Curry's] assessment." J.A., Ex. 46. According to Curry, DeWeese-Boyd was a "strong teacher" with "very high" teaching evaluations. Id. However, DeWeese-Boyd's scholarly productivity "did not reach acceptable levels" for a Gordon faculty member, and her professionalism and follow through on institutional projects about which she may not feel passionate was lacking. J.A., Ex. 46.
---------------------------
[17] The extent to which DeWeese-Boyd participated in these religious services is unclear in the record.
                                                            Page 16 of 54
            DeWeese-Boyd contends Gordon College denied her promotion because she "has been one of the most outspoken critics among the Gordon College faculty regarding the College's policies and practices" concerning "LGBTQ+ individuals" and the College's prohibition against sexual activity outside of marriage between one man and one woman. Complaint, ¶18. DeWeese-Boyd claims her "outspoken" criticism and her gender resulted in the denial of her application for promotion. Complaint, ¶25.
DISCUSSION
            In Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C., 565 U.S. 171, 188-190 (2012) ("Hosanna-Tabor"), the United States Supreme Court recognized the existence of the "ministerial exception" as an affirmative defense for the first time. Citing Hosanna-Tabor and other cases, Gordon College argues it is entitled to invoke the ministerial exception affirmative defense because it is a religious institution and DeWeese-Boyd was a ministerial employee, and, accordingly, it is entitled to summary judgment on all DeWeese-Boyd's claims.
            On the other hand, also citing Hosanna-Tabor and other cases, DeWeese-Boyd argues summary judgment should enter in her favor, dismissing the ministerial exception affirmative defense, because the ministerial exception is inapplicable here since Gordon College is not a religious institution and she was not a ministerial employee. Alternatively, she argues that, even if the Court decides the ministerial exception applies, the exception does not bar her contract-based and gender discrimination claims.
            As discussed below, the Court finds that, although Gordon is a religious institution for purposes of the ministerial exception, DeWeese-Boyd was not a
                                                            Page 17 of 54
ministerial employee. Therefore, Gordon may not invoke the exception to bar any of DeWeese-Boyd's claims and summary judgment dismissing the affirmative defense must enter in her favor.[18]
            I. STANDARD OF REVIEW 
            A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and responses to requests for admission under Rule 36, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56(c). "The moving party has the burden of demonstrating affirmatively the absence of a genuine issue of material fact on every relevant issue, regardless of who would have the burden on that issue at trial." Arcidi v. NAGE, Inc., 447 Mass. 616, 619 (2006).
            The party opposing summary judgment must respond and allege facts establishing the existence of a genuine issue of material fact for trial. Polaroid Corp. v. Rollins Envtl.  Servs. (N.J.), Inc., 416 Mass. 684, 696 (1993). Moreover, "[i]n deciding a motion for summary judgment, the motion judge must consider all factual allegations, and draw all reasonable inferences therefrom, in favor of the nonmoving party." Godfrey v. Globe  Newspaper Co., Inc., 457 Mass. 113, 119 (2010); see also Willitts v. Roman Catholic  Archbishop of Boston, 411 Mass. 202, 202 (1991) (any conflicts in the supporting materials are answered in favor of the non-movant). However, although the Court views the evidence in the light most favorable to the non-moving party, it does not weigh
---------------------------
[18] The parties agree that the determination of whether the ministerial exception affirmative defense applies to prohibit DeWeese-Boyd's claims is a matter appropriate for resolution at the summary judgment stage. As discussed below, case law applying the exception confirms this.
                                                            Page 18 of 54
evidence, assess credibility, or find facts. Drakopoulos v. United States Bank Nat'l  Ass'n, 465 Mass. 775, 788 (2013) (quoting O'Connor v. Redstone, 452 Mass. 537, 550 (2008)).
            II. OVERVIEW OF THE MINISTERIAL EXCEPTION 
            The First Amendment to the United States Constitution provides, in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Generally speaking, the Religion Clauses of the First Amendment bar government action that establishes religion (Establishment Clause) or interferes with the practice of religion (Free Exercise Clause).
            As relevant here, "[t]he Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own [ministers]." Hosanna-Tabor, 565 U.S. at 184. More specifically, "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." Id. at 181. Therefore, as relevant here, the essence of the Religion Clauses is that a court should neither require a religious institution to retain or accept an unwanted minister, nor punish it for not doing so because, to do so, interferes with the institution's internal governance.
            The Federal Circuit Courts of Appeals and various state appellate courts, including the Supreme Judicial Court,[19] "have uniformly recognized the existence of a
---------------------------
[19] In Williams v. Episcopal Diocese of Mass., 436 Mass. 574 (2002), the SJC affirmed the dismissal of an Episcopal priest's claim of sexual discrimination brought under G.L. c. 151B, § 4. Id. at 575. In so doing, the SJC observed that Federal courts had long recognized the ministerial exception to "preclude[] civil courts from adjudicating employment discrimination suits by ministers against their church or religious institution." Id. at 577 (citations omitted). Without specifically adopting the ministerial exception, or its nomenclature, the SJC applied the exception in substance when it ruled that the Religion Clauses of the First Amendment "precludes jurisdiction of civil courts over church disputes touching on matters of doctrine, canon law, polity, discipline, and ministerial relationships [and] is firmly established in Massachusetts case law." Id. at 579 (citations omitted).
                                                            Page 19 of 54
'ministerial exception,' grounded in the First Amendment, that precludes application of [civil rights] legislation to claims concerning the employment relationship between a religious institution and its ministers."[20] Id. at 188 (citations omitted). However, it was not until 2012 in Hosanna-Tabor that the Supreme Court had an opportunity to officially recognize the ministerial exception for the first time. In so doing, the Court clarified that the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, [rather than] a jurisdictional bar." Id. at 195 n.4.
            In reaching the holding in Hosanna-Tabor, the Supreme Court stated:
Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.
Id. at 188- 189.
            Accordingly, the Supreme Court observed that the purpose of the ministerial exception "is not to safeguard a church's decision to fire a minister only when it is made for a religious reason." Id. at 194. Rather, the purpose is to "ensure[] that the authority to
---------------------------
[20] The ministerial exception traces its roots to the Fifth Circuit's decision in McClure v. Salvation  Army, 460 F.2d 553 (5th Cir. 1972). See Kirby v. Lexington Theol. Seminary, 426 S.W.3d 597, 605 (Ky. 2014) ("Barring a Salvation Army employee's Title VII claim, the Fifth Circuit, in creating the ministerial exception over forty years ago [in McClure)], relied heavily on preserving church autonomy and not even peeking over the 'wall of separation' between church and state.") (quoting McClure, 460 F.2d at 558).
                                                            Page 20 of 54
select and control who will minister to the faithful -- a matter 'strictly ecclesiastical,' [ ] -- is the church's alone." Id. at 194 - 195 (quoting Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 119 (1952)).[21]
            Not long after the Supreme Court's decision in Hosanna-Tabor, the Supreme Judicial Court applied the holding in Temple Emanuel of Newton v. Massachusetts  Comm'n Against Discrimination, 463 Mass. 472 (2012) ("Temple Emanuel"). In that case, the SJC held that the ministerial exception prohibited discrimination claims asserted by a teacher that "taught religious subjects at a school that functioned solely as a religious school, whose mission was to teach Jewish children about Jewish learning, language, history, traditions, and prayer." Id. at 486. In so holding, the SJC in Temple Emanuel stated:
In deciding whether the ministerial exception applies to a religious school teacher, the fundamental question is whether it would infringe the free exercise of religion or cause excessive entanglement between the State and a religious group if a court were to order a religious group to hire or retain a religious teacher that the religious group did not want to employ, or to order damages for refusing to do so We conclude that it would. Where a school's sole mission is to serve as a religious school, the State should not intrude on a religious group's decision as to who should (and should not) teach its religion to the children of its members.
Id. (internal citations omitted) (emphasis added).
            For the ministerial exception to apply as a bar to an employment discrimination claim, the employer must demonstrate two things: (a) that it is a religious institution;
---------------------------
[21] "The ministerial exception is best understood as a narrow, more focused subsidiary of the ecclesiastical abstention doctrine," Kirby, 426 S.W.3d at 604, which is also called the church autonomy doctrine. Doe v. First Presbyterian Church U.S.A., 421 P.3d 284, 288 - 289 (Ok. 2017). That doctrine, first recognized in Watson v. Jones, 80 U.S. 679 (1871), is rooted in the Religious Clauses of the First Amendment and prohibits courts from interfering "in matters of church government, faith and doctrine." Doe 421 P.3d at 289.
                                                            Page 21 of 54
and, (b) that the employee is a ministerial employee (i.e., a "minister").[22] EEOC v. R.G., 884 F.3d 560, 581 (6th Cir. 2018) (citations omitted); see also Lishu Yin v. Columbia  Intl Univ., 335 F. Supp. 3d 803, 812 (D. S.C. 2018) ("In order for the ministerial exception to apply, an employer must be a religious institution, and an employee must be a minister.") (citation omitted); Kirby v. Lexington Theol. Seminary, 426 S.W.3d 597, 609 (Ky. 2014) ("The application of the ministerial exception requires two main inquiries: 1) is the employer a religious institution, and 2) is the employee a minister.") (citation omitted); Winbery v. La. College, 124 So. 3d 1212, 1215 (La. Ct. App. 2013) (same).
III. GORDON COLLEGE IS A RELIGIOUS INSTITUTION FOR  PURPOSES OF THE MINISTERIAL EXCEPTION 
            As stated, "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." Hosanna-Tabor, 565 U.S. at 181 (emphasis added); see also id. at 184 ("The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own.") (emphasis added). Hence, the first prong of the ministerial exception doctrine requires the Court to determine whether Gordon, the employer, is a religious institution capable of employing ministers.
            Gordon College argues it qualifies as a religious institution for purposes of the ministerial exception because its mission is marked by clear and obvious religious characteristics. On the other hand, DeWeese-Boyd argues Gordon is not a religious
---------------------------
[22] This Court has found very few reported Massachusetts decisions interpreting and applying the ministerial exception, in general, and the Hosanna-Tabor decision, specifically. As such, in resolving the pending motions, the Court has looked to other jurisdictions that have applied the exception and the holding in Hosanna-Tabor.
                                                            Page 22 of 54
institution because its primary purpose is that of a liberal arts college, not a religious institution; it is not affiliated with any particular church or denomination; and, it declined to identify itself with the Commonwealth as having a religious purpose. The Court agrees with Gordon College.
            Unfortunately, Hosanna-Tabor is not helpful in determining the first prong of the ministerial exception doctrine, i.e., determining whether the employer is a religious institution capable of having "ministers," because the status of the plaintiff employer as a "religious group" was not at issue and not addressed by the Court. See Hosanna-Tabor, 565 U.S. at 177 (referring to "the employer [als a religious group"); see also Winbery, 124 So. 3d at 1214 (stating Hosanna-Tabor did not address how to determine whether the defendants were a religious organization entitled to protection under the Religious Clauses).[23]
            Therefore, the Supreme Court did not provide any guidance in Hosanna-Tabor for trial courts to use to determine what organizations may properly invoke the ministerial exception. Nevertheless, both before and after Hosanna-Tabor, "[n]umerous courts have held that the term 'religious institution,' in this context, can include religiously affiliated schools, hospitals, and corporations." Shaliehsabou v. Hebrew  Home of Greater Wash., Inc., 363 F.3d 299, 310 (4th Cir. 2004) (citations omitted).
            For example, in Kirby, decided after Hosanna-Tabor, the Supreme Court of Kentucky stated:
---------------------------
[23] Likewise, in Temple Emanuel there was no dispute that the employer was a "religious group" capable of having "ministers." See Temple Emanuel, 463 Mass. at 484 ("[The teacher] does not dispute that the mission of the [plaintiff] religious school is to instill in its students a commitment to lifelong Jewish learning and build on the central values of Jewish heritage, including learning, worship, and acts of loving kindness.").
                                                            Page 23 of 54
Importantly, the scope of "religious institution" is not so narrow that only traditional faith communities qualify. Across the federal circuits, the ministerial exception has been applied to religiously affiliated hospitals, schools, and corporations because they were sufficiently within the understanding of "religious institution." An entity, allegedly religiously affiliated, will be considered a "religious institution" for purposes of the ministerial exception "whenever that entity's mission is marked by clear or obvious religious characteristics."
426 S.W.3d at 609 (citations and footnotes omitted) (emphasis added).
            In Conlon v. Intervarsitv Christian Fellowship/USA, 777 F.3d 829 (6th Cir. 2015), the plaintiff "worked at InterVarsity Christian Fellowship/USA ("IVCF") in Michigan as a spiritual director, involved in providing religious counsel and prayer." Conlon, 777 F.3d at 831. The employer, IVCF, was:
"[A]n evangelical campus mission serving students and faculty on college and university campuses nationwide," whose "vision is to see students and faculty transformed, campuses renewed and world changers developed." IVCF's purpose "is to establish and advance at colleges and universities witnessing communities of students and faculty who follow Jesus as Savior and Lord: growing in love for God, God's Word, God's people of every ethnicity and culture and God's purposes in the world."
Id.
            In Conlon, IVCF terminated the plaintiffs employment as a spiritual director upon learning she was contemplating divorce. Id. The plaintiff sued IVCF, claiming gender discrimination under federal and Michigan law. Id. at 832. Taking its "first opportunity since the Supreme Court's decision in Hosanna-Tabor . . . to address the 'ministerial exception," id. (citation omitted), the Sixth Circuit recognized that, "[u]nlike the defendant in Hosanna-Tabor, IVCF is not a church. So [the court] must first determine whether IVCF is an organization that can assert the ministerial exception." Id. at 833. In
                                                            Page 24 of 54
concluding that IVCF was a religious organization protected by the ministerial exception, the Sixth Circuit stated:
[T]he ministerial exception's applicability does not turn on its being tied to a specific denominational faith; it applies to multidenominational and nondenominational religious organizations as well.. . . "[I]n order to invoke the exception, an employer need not be a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization.". . . "[A] religiously affiliated entity" is one whose "mission is marked by clear or obvious religious characteristics.". ... That is clearly the case for IVCF, with not only its Christian name, but its mission of Christian ministry and teaching.
Id. at 834 (internal citations omitted).
            In Shaliehsabou, the Fourth Circuit observed that it "ha[d] never addressed whether the phrase 'religious institution,' in the context of the ministerial exception, applie[d] only to churches or church-operated entities, or whether it ha[d] broader meaning." Shaliehsabou, 363 F.3d at 310. There, without "decid[ing] the full reach of the phrase 'religious institution," id. at 311, the Fourth Circuit held that the ministerial exception applied to a "religiously affiliated" Jewish nursing home because: (a) "its By-Laws define[d] it as a religious and charitable non-profit corporation"; (b) its mission was "to provide elder care to 'aged of the Jewish faith in accordance with the precepts of Jewish law and customs"; and, (c) "[p]ursuant to [this] mission," the nursing home "maintained a rabbi on its staff, employed mashgichim to ensure compliance with the Jewish dietary laws, and placed a mezuzah on every resident's doorpost." Id. at 310 – 311.
            In Penn v. N.Y. Methodist Hosp., 884 F.3d 416 (2nd Cir. 2018), the Second Circuit "determine[d] whether a hospital—only historically connected to the United Methodist Church but still providing religious services through its pastoral care
                                                            Page 25 of 54
department—can invoke [the ministerial exception]." Id. at 418. There, the hospital: (a) was "no longer affiliated with the United Methodist Church"; (b) "took steps to distance itself from its religious heritage"; (c) changed its "by-laws [to] no longer require the hospital to seek permission from the United Methodist Church to make significant business decisions"; (d) did not "give the United Methodist Church the power to veto any amendment to the hospital's articles of incorporation"; and, (e) did not have a religious affiliation that "pervade[d] its work as a healthcare organization." Id. at 425. Acknowledging that whether the hospital qualified as a "religious group" was "a close question," id. at 423, the Second Circuit held that the hospital was such a group given "its history and continuing purpose," id. at 424, and the fact that the employee worked as a chaplain in "the hospital's Department of Pastoral Care." Id. at 425.
            The case of EEOC v. R.G. is instructive on the limits to finding an entity qualifies as a religious institution for purposes of invoking the ministerial exception. In that case, the employer was a funeral home with "a mission statement. . . that [its] 'highest priority [wa]s to honor God in all that we do as a company and as individuals' and include[d] a verse of scripture on the bottom of the mission statement webpage." Id. at 568. The funeral director "was terminated from the [f]uneral [h]ome . . . shortly after [she] informed [the owner] that she intended to transition from male to female and would represent herself and dress as a woman while at work." Id. at 566. On appeal, citing Conlon, the amici argued the ministerial exception applied to the former funeral director's claim for unlawful sex discrimination. Id. at 581. The Sixth Circuit disagreed, stating:
As we made clear in Conlon, the ministerial exception applies only to "religious institution[s]." . . . While an institution need not be "a
                                                            Page 26 of 54
church, diocese, or synagogue, or an entity operated by a traditional religious organization,". . ., to qualify for the exception, the institution must be "marked by clear or obvious religious characteristics[.]"
            . . .
The Funeral Home, by comparison, has virtually no "religious characteristics." Unlike the campus mission in Conlon, the Funeral Home does not purport or seek to "establish and advance" Christian values. . . . [T]he Funeral Home "is not affiliated with any church; its articles of incorporation do not avow any religious purpose; its employees are not required to hold any particular religious views; and it employs and serves individuals of all religions.". . Though the Funeral Home's mission statement declares that "its highest priority is to honor God in all that we do as a company and as individuals," . . ., the Funeral Home's sole public displays of faith, . . . amount to placing "Daily Bread" devotionals and "Jesus Cards" with scriptural references in public places in the funeral homes, which clients may pick up if they wish[.] . The Funeral Home does not decorate its rooms with "religious figures" because it does not want to "offend[] people of different religions." .. ..The Funeral Home is open every day, including on Christian holidays.
Id. at 582 (internal citations omitted) (emphasis added).
            In Lishu Yin, another case decided after Hosanna-Tabor, the court held that a multidenominational Christian college that identified itself as a ministry was a religious institution that could invoke the ministerial exception. 335 F. Supp. 3d at 814 — 815. The court concluded that the college "possesse[d] 'obvious religious characteristics," because it "train[ed] Christians for global missions, full-time Christian ministry in a variety of strategic professions, and marketplace ministry." Id. at 815 (citation omitted). "Moreover, as part of its mission, '[the college] educated people from a Biblical worldview to impact the nations with the message of Christ." Id. (citation omitted).
            This Court has found very few reported decisions applying the ministerial exception to a religious liberal arts college, such as Gordon. Two such cases are EEOC  v. Mississippi College, 626 F.2d 477 (5th Cir. 1980), and Winberv.
                                                            Page 27 of 54
            The case of Mississippi College involved "a four-year coeducational liberal arts institution[,]. . . owned and operated by the Mississippi Baptist Convention (Convention), an organization composed of Southern Baptist churches in Mississippi." Id. at 478. "The Convention conceive[d] of education as an integral part of its Christian mission." Id. at 479. "Mississippi College [had a policy that sought] to assure that faculty and administrative officers [we]re committed to the principle that 'the best preparation for life is a program of cultural and human studies permeated by the Christian ideal, as evidenced by the tenets, practices and customs of the Mississippi Baptist Convention and in keeping with the principles and scriptures of the Bible." Id. Further, "[t]he College's facilities include[d] prayer rooms available for use by the students." Id.
            An applicant for an open position as a full-time psychology professor "filed a charge of discrimination with the EEOC, alleging that Mississippi College had discriminated against her on the basis of sex" in failing to hire her. Id. In finding that "[t]he employment relationship between Mississippi College and its faculty and staff is one intended by Congress to be regulated by Title VII[,]" (i.e., in finding the ministerial exception did not app ly)[24] the Fifth Circuit stated:
The College is not a church. The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.
---------------------------
[24] The term "ministerial exception" was not used by the Fifth Circuit. However, the substance of its analysis was the application of the ministerial exception doctrine in the context of a challenge to an administrative subpoena issued by the EEOC.
                                                            Page 28 of 54
Id. at 485 (emphasis added). Therefore, unlike all other Federal Circuit Courts, the Fifth Circuit conflated the two prongs of the ministerial exception doctrine by focusing solely on the role and functions of the college's faculty and staff, and not on the religious attributes of the institution, itself.
            In Winberv, the other case this Court found involving a religious liberal arts college, the Court of Appeal of Louisiana (Third Circuit), addressed the trial court's dismissal for lack of subject matter jurisdiction of the plaintiffs' claims of defamation and violations of civil rights against Louisiana College, a religious liberal arts college.[25] Winberv, 124 So. 3d at 1213. Relying on Hosanna-Tabor, the "[d]efendants argued that [the] [p]laintiffs' suit was barred by the First Amendment's Free Exercise Clause because the claims at issue concerned the employment relationship between a religious institution, or church, and one of its ministers."[26] Id. at 1214. On the other hand, relying on Mississippi College, the plaintiffs in Winberv, former professors at Louisiana College, argued that the ministerial exception did not apply because "Louisiana College is [a] non-hierarchical religious college," not a church, and the plaintiffs "were not ministers." Id. The Court of Appeal of Louisiana ruled that Mississippi College, rather than Hosanna-Tabor, controlled on the issue of whether Louisiana College was a religious institution, and that the college was not such an entity. Id. at 1217. In so ruling, the Court of Appeal stated:
---------------------------
[25] The plaintiffs also brought claims against Louisiana Inerrancy Fellowship, which were not dismissed and not at issue.
[26] "Additionally, [the] [d]efendants contend[ed] that determining the validity of [the] [p]laintiffs' claims would require a court to determine the truth or falsity of certain religious beliefs and Baptist ecclesiastical disagreements over inerrancy or literal truth of the Bible as scripture, thereby violating the constitutional protections against government entanglement with religion found in the First Amendment's Establishment Clause." Id.
                                                            Page 29 of 54
The trial court was correct in noting the clear similarities between Louisiana College and Mississippi College. Both colleges are coeducational liberal arts institutions that have undergraduate curricula which require all students to take certain religious courses. Mississippi College was owned and operated by the Mississippi Baptist Convention, an organization composed of Mississippi's Southern Baptist Churches. Louisiana College is governed by a Board of Trustees, elected by the Louisiana Baptist Convention, an organization composed of Louisiana's Southern Baptist Churches.
Id. at 1217 (citation omitted). Therefore, the Court of Appeal in Winbery "f[ou]nd no error in the trial court's determination that the ministerial exception of the First Amendment's Free Exercise Clause [wa]s inapplicable." Id. at 1218.[27]
            At bottom, three principles are clear from the case law applying the first prong of the ministerial exception determination, i.e., whether the employer is a religious institution. First, "in order to invoke the [ministerial] exception, an employer need not be a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization." Conlon, 777 F.3d 829 at 834 (quotations and citation omitted). Second, notwithstanding the decisions in Mississippi  College and Winbery, the exception applies to a "religiously affiliated entity," whose "mission is marked by clear or obvious religious characteristics." Shaliehsabou, 363 F.3d at 310; see also Kirby, 426 S.W. 3d at 609 ("An entity, allegedly religiously
---------------------------
[27] This ruling appears to be dicta. The Court of Appeal ultimately ruled that the defendant college's appeal was "without merit" because it impermissibly challenged "the reasons for judgment [i.e., that the college did not qualify for the ministerial exception] and not the judgment itself [i.e., that the trial court lacked subject matter jurisdiction]." Id. Thus, the court in Winbery  went on to apply the ministerial exception to the plaintiffs' "appeal[] [of] the trial court's ruling that it did not possess subject matter jurisdiction over their claims pursuant to the Establishment Clause." Id. at 1214. In so doing, the Winberv court ruled that "[t]he trial court was correct in holding that the dispute. . . centers on the nature of Baptist theology and church governance over how theology is taught at Louisiana College and would, thus, require the court to impermissibly entangle itself in deciding ecclesiastical matters[,]" thus, the trial court judgment that it lacked subject matter jurisdiction was correct. Id.
                                                            Page 30 of 54
affiliated, will be considered a 'religious institution' for purposes of the ministerial exception 'whenever that entity's mission is marked by clear or obvious religious characteristics."'). Third, and of particular significance to this case, "[j]ust like churches, schools may pursue a religious mission. Indeed, education is at the core of religious activity for many Americans." Duquesne Univ. of the Holy Spirit v. NLRB, 947 F.3d 824, 828 (D.C. Cir. 2020) (citations omitted).
            Applying the above case law and principles here, the Court finds Gordon College qualifies as a religious institution for purposes of the first prong of the ministerial exception doctrine. Gordon's Restated Articles Of Organization state that it was formed to provide instruction in the Bible, and to prepare students missionary work, Christian ministry, and "other special forms of Christian work." Similarly, according to its Bylaws, Gordon is dedicated the evangelical biblical faith, integrally Christian scholarship, programs that reflect "the rich mosaic of the Body of Christ," a life guided by the "teaching of Christ and the empowerment of the Holy Spirit," and applying biblical principles "to transform society and culture."
            In addition, Gordon's mission is as "an intentional Christian community" that serves those who "embrace the College's broadly evangelical identity" and desire an experience that "combines an exceptional liberal arts education with an informed Christian faith." Further, undergraduates wishing to attend Gordon must affirm their belief in the Christian faith, a purpose of Gordon's Core Curriculum "is to foster knowledge of God's character and purpose as revealed in Scripture," and attending students are required to take religious-based courses and attend religious services on campus.
                                                            Page 31 of 54
            Moreover, when applying to work at Gordon College, all applicants must sign a Memorandum Of Understanding, in which applicants agree to support the goal of Gordon College to serve "as a distinctively Christian Institution of higher learning," agree with the Statement of Faith (which sets forth certain tenets of the Christian evangelical faith), and agree to abide by Gordon's Statement of Life and Conduct (which includes a set of biblical-based behavioral standards). Further, faculty members are expected to integrate faith and teaching. Finally, Gordon's campus has two chapels, and Christian artwork, artifacts, and Bible verses are displayed (and Christian music is played) throughout the campus.
            In the face of the record evidence, DeWeese-Boyd's three arguments that Gordon College does not qualify as a religious institution for purposes of the ministerial exception are unpersuasive. First, DeWeese-Boyd claims the College should not be deemed a religious institution because it is not affiliated with any particular church or denomination. However, as stated, copious case law makes it clear that "[t]he ministerial exception's applicability does not turn on its being tied to a specific denominational faith; it applies to multidenominational and nondenominational religious organizations as well." Conlon, 777 F.3d at 834; see also Grussgott v. Milwaukee  Jewish Day Sch., Inc., 882 F.3d 655, 658 (7th Cir. 2018) ("There is no requirement that an organization exclude members of other faiths in order to be deemed religious.") (citing Hosanna-Tabor, 565 U.S. at 177).
            Second, DeWeese-Boyd argues Gordon College is not a religious institution because its primary purpose is that of a liberal arts college. This assertion is equally unavailing. The Court has found, and DeWeese-Boyd has cited, no case that stands for
                                                            Page 32 of 54
the proposition that to qualify as a religious institution an entity's purpose must be primarily or solely religious. In fact, "[a]n entity can provide secular services and still have substantial religious character." Shaliehsabou, 363 F.3d at 310. As explained above, numerous religiously affiliated entities, such as schools and hospitals, which serve more than one purpose, have been deemed religious institutions for purposes of the ministerial exception. Thus, the fact that Gordon College is an educational institution does not prevent it from also qualifying as a religious organization.
            Third, DeWeese-Boyd argues Gordon College does not qualify as a religious institution because it identifies its purpose in its annual filings with the Commonwealth as "higher learning" and it "declines" to identify itself as having a religious purpose. However, this is just another version of DeWeese-Boyd's second argument, that Gordon is primarily an educational institution.
In sum, like the entities in  Lishu Yin, Shaliehsabou and Penn, the record evidence supports the conclusion that Gordon College qualifies as a religious institution for purposes of the first prong of the ministerial exception determination. At bottom, Gordon's mission has clear religious characteristics.
            IV. DEWEESE-BOYD IS NOT A MINISTERIAL EMPLOYEE 
            Now that the Court has ruled that Gordon is a religious institution for the purposes of the ministerial exception, a more challenging question remains regarding whether DeWeese-Boyd qualifies as a ministerial employee for purposes of the exception. In Hosanna-Tabor, the Supreme Court "recognized that the ministerial exception is not limited to the 'head of a religious congregation,' but declined to adopt a 'rigid formula for deciding when an employee qualifies as a minister." Temple Emanuel,
                                                            Page 33 of 54
463 Mass. at 485 (quoting Hosanna-Tabor, 565 U.S. at 190). Instead, Hosanna-Tabor  identified four "considerations" it found relevant to the determination in that case: (1) the employee's "formal title;" (2) "the substance reflected in that title;" (3) the employee's "use of that title;" and, (4) "the important religious functions [the employee] performed." Hosanna-Tabor, 565 U.S. at 192.
            In addition to the above factors used by the Court in Hosanna-Tabor, it is important to recognize the "three errors" the Court found the Sixth Circuit made in holding that the ministerial exception did not apply. Id. at 192. "First, the Sixth Circuit failed to see any relevance in the fact that [the employee] was a commissioned minister. . . . It was wrong for the Court of Appeals. . . to say that an employee's title does not matter." Id. at 192 — 193. "Second, the Sixth Circuit gave too much weight to the fact that lay teachers at the school performed the same religious duties as [the employee]. . . . [T]hough relevant, it cannot be dispositive that others not formally recognized as ministers by the church perform the same functions." Id. at 193. "Third, the Sixth Circuit placed too much emphasis on [the employee's] performance of secular duties. It is true that her religious duties consumed only 45 minutes of each work- day, and that the rest of her day was devoted to teaching secular subjects.. .. The issue. .. , however, is not one that can be resolved by a stopwatch. The amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation, without regard to the nature of the religious functions performed and the other considerations discussed above." Id. at 193 — 194.
            Gordon College argues that in applying the ministerial exception, both before and after Hosanna-Tabor, courts focus on the functions the employee performed for the
                                                            Page 34 of 54
religious organization. Here, according to Gordon, because DeWeese-Boyd was responsible for integrating its faith-based beliefs into her teachings, she qualifies as a ministerial employee.
            On the other hand, relying on a strict application of the factors identified in Hosanna-Tabor, DeWeese-Boyd argues she was not a ministerial employee because her title did not suggest any ministerial or religious role, she did not hold herself out as a minister, and she did not perform any religious functions of a minister. The Court concludes the strict application urged by DeWeese-Boyd is misplaced and inconsistent with how the ministerial exception has been applied before and after Hosanna-Tabor. Nevertheless, as discussed below, the Court finds that, when applying the proper framework, DeWeese-Boyd is not a minister for purposes of the exception.
A. The Functional Approach In Determining Whether An  Employee Qualifies As A "Minister" 
            Before the Supreme Court decided Hosanna-Tabor, the majority of courts that applied the ministerial exception took a functional approach, i.e., focusing on the employee's functions while employed at the religious organization. See, e.g., Hollins v.  Methodist Healthcare, Inc., 474 F.3d 223, 226 (6th Cir. 2007) (noting that other federal Circuits "have considered a particular employee to be a 'minister' for purposes of the ministerial exception based on the function of the plaintiff's employment position rather than the fact of ordination."); Petruska v. Gannon Univ., 462 F.3d 294, 304 n.6 (3rd Cir. 2006) ("In evaluating whether a particular employee is subject to the ministerial exception, other circuits have concluded that the focus should be on the 'function of the position.") (quoting Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164, 1168 (4th Cir. 1985)); Dayner v. Archdiocese of Hartford, 23 A.3d 1192,
                                                            Page 35 of 54
1204 (Conn. 2011) ("In determining whether a plaintiffs employment related claims against a religious institution are subject to the ministerial exception, the federal circuit courts generally rely in the first instance on the 'primary duties analysis [that] requires a court to objectively examine an employee's actual job function, not her title, in determining whether she is properly classified as a minister.") (citations omitted); Coulee Catholic School v. Labor & Indus. Review Comm'n, 768 N.W.2d 868, 881 n.16 (Wis. 2009) ("The focus. . . should be on the function of the position, not the title or a categorization of job duties."); Pardue v. Center City Consortium Schs. of the  Archdiocese of Washington, Inc., 875 A.2d 669, 675 (D.C. Ct. App. 2005) ("inquiry focuses on the function of the position at issue and not on categorical notions of who is or is not a minister.") (citations and internal quotations omitted); EEOC v. Catholic  Univ., 83 F.3d 455, 463 (D.C. Cir. 1996) ("the ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission.").
            To be sure, "[t]he functional consensus has held up over time[,]" and the Court's decision in Hosanna-Tabor "should not be read to upset this consensus." 565 U.S. at 202, 204 (Alito, J., concurring with whom Kagan, J., joined). As Justice Alito noted:
Because virtually every religion in the world is represented in the population of the United States, it would be a mistake if the term "minister" or the concept of ordination were viewed as central to the important issue of religious autonomy that is presented in cases like this one. Instead, courts should focus on the function performed by persons who work for religious bodies.
Id. at 198 (emphasis added). Therefore, after Hosanna-Tabor, the majority of courts that have considered the ministerial exception have continued to apply a functional analysis
                                                            Page 36 of 54
when determining whether an employee qualifies as a ministerial employee, while still applying the four Hosanna-Tabor factors.[28]
            For example, in Cannata v. Catholic Diocese of Austin, 700 F.3d 169 (5th Cir. 2012), the "first opportunity for the [Fifth Circuit] to address the ministerial exception in light of Hosanna-Tabor[,]" id. at 170, the Fifth Circuit ruled that the exception applied to the music director at a Catholic Church, despite his argument "that he merely played the piano at Mass and that his only responsibilities were keeping the books, running the sound system, and doing custodial work, none of which was religious in nature." Id. at 177. According to the Fifth Circuit, "[a]pplication of the exception" did not "depend on finding that Cannata satisfie[d] the same considerations that motivated the [Supreme Court] to find that [the plaintiff in Hosanna-Tabor] was a minister within the meaning of the exception." Id. Instead, it was "enough" that Cannata "played an integral role in the celebration of Mass and [by] playing piano during services, [he] furthered the mission of the church and helped convey its message to the congregants." Id. In reaching this conclusion, the Fifth Circuit pointed out that it was important not to "overemphasize" the "performance of secular duties." Id. (rejecting the idea that the ministerial exception
---------------------------
[28] Both before and after Hosanna-Tabor, while using a functional approach, many courts focused on the employee's "primary duties." See e.g., Petruska 462 F.3d at 304 n.6 ("As a general rule, an employee will be considered a minister if her primary duties include 'teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in religious ritual and worship.") (citations omitted); Shaliehsabou, 363 F.3d at 306 (applying "the same primary duties test" that is used when determining the ministerial exception in Title VII cases as in claims brought under the Fair Labor Standards Act). Further, at least one court has observed that in Hosanna-Tabor "the Court did seem to cast considerable doubt on the 'primary duties' test as used by the Sixth Circuit below. Importantly, the 'primary duties' test has been prominent throughout the federal circuits with a few circuits now shifting away." Kirby, 426 S.W.3d at 606 (citations and footnote omitted). However, as explained below, whether one examines DeWeese-Boyd's "primary duties" or her "functions" while employed at Gordon, one reaches the same conclusion: she was not a "minister."
                                                            Page 37 of 54
should be limited to those who perform exclusively religious functions) (citing Hosanna-Tabor, 565 U.S. at 193)).
            With few exceptions, later decisions continued to follow this functional-type approach. In Fratello v. Archdiocese of N.Y., 863 F.3d 190 (2nd Cir. 2017), the Second Circuit's first occasion to address the ministerial exception after Hosanna-Tabor, id. at 192, the former principal of a Roman Catholic school alleged she was terminated from her position based on gender discrimination and retaliation. Id. at 192. In applying the exception, the Second Circuit stated, "Hosanna-Tabor instructs only. . . what [the courts] might take into account as relevant .. . it neither limits the inquiry to [the four considerations identified] nor requires their application in every case." Id. at 204-205. Instead, according to the Second Circuit, "courts should focus primarily on the function[s] performed by persons who work for religious bodies," as "[i]t is the relationship between the activities the employee performs for her employer, and the religious activities that the employer espouses and practices, that determines whether employment-discrimination laws implicate the religious group's First Amendment rights[.]" Id. (quotations and citations omitted). The Second Circuit ruled that the plaintiff was a minister because, "[a]lthough her formal title was not inherently religious, . .. the record clearly establishe[d] that she held herself out as a spiritual leader of the school, and that she performed many significant religious functions to advance its religious mission." Id. at 192.
            The SJC likewise used the functional approach in Temple Emanuel. In that case, the SJC applied the ministerial exception to prohibit the plaintiffs age discrimination claim even though "she was not a rabbi, was not called a rabbi, and did not hold herself
                                                            Page 38 of 54
out as a rabbi." 463 Mass. at 486. According to the SJC, "the ministerial exception applie[d] to the school's employment decision regardless whether [the plaintiff was] . .. called a minister or h[eld] any title of clergy" because "an employee's title is not determinative of. . . status as a minister, and there is consensus among the courts that a minister is defined by. . . function, rather than .. . title." Id. (citing Hosanna-Tabor, 565 U.S. at 206 (Alito, J., concurring, with whom Kagan, J., joined)).
            Examination of a post-Hosanna-Tabor case in which a court applied a functional approach, but hewed closely to the Hosanna-Tabor factors is also instructive. In Herx v.  Diocese of Fort Wayne-South Bend Inc., 48 F. Supp. 3d 1168 (N.D. Ind. 2014), "[t]he Diocese of Fort Wayne-South Bend, Inc. and St. Vincent De Paul School declined to renew [the plaintiff's] teaching contract after learning that she was undergoing in vitro fertilization in an effort to become pregnant." Id. at 1170. The plaintiff sued the Diocese and school, claiming sex discrimination. Id. The defendants argued on summary judgment that the ministerial exception applied because:
[Although] [the plaintiff] wasn't employed as a religion teacher, she qualified as a "minister" because the Church, the School, and the parents of students at the school expected and relied on her to perform the function of a minister every day while teaching her students. According to the Diocese, even [the plaintiff] agreed that she was to provide students with an example of how to live their faith to share her devotion to God whenever she could. These functions, the Diocese claims, go to the heart of what makes St. Vincent de Paul School a Catholic school.
Id. at 1176 (emphasis added).
            Applying Hosanna-Tabor, the court in Herx disagreed with the defendants and ruled that the plaintiff was not a "minister" for purposes of the ministerial exception. Id. at 1177. In so ruling, the court stated:
                                                            Page 39 of 54
The Diocese hasn't shown that [the plaintiff's] teaching qualifications or job responsibilities in any way compare to [the teacher in Hosanna-Taborrs situation. Nothing in the summary judgment record suggests that [the plaintiff] was a member of the clergy of the Catholic Church. [The plaintiff] has never led planning for a Mass, hasn't been ordained by the Catholic Church, hasn't held a title with the Catholic Church, has never had (and wasn't required to have) any religious instruction or training to be a teacher at the school, has never held herself out as a priest or minister, and was considered by the principal to be a "lay teacher." The religion teachers for the Diocese schools have different contracts than the non-religion teachers and are required to have religious education and training. For example, [ ] a religion teacher in the Diocese, has a Master's Degree in Theology. Labeling [the plaintiff] a "minister" based on her attendance and participation in prayer and religious services with her students, which was done in a supervisory capacity, would greatly expand the scope of the ministerial exception and ultimately would qualify all of the Diocese's teachers as ministers, a position rejected by the Hosanna-Tabor Court.
Id. at 1177.
B. The Totality Of The Circumstances Approach In Determining  Whether An Employee Qualifies As A "Minister" 
            Since Hosanna-Tabor, while still focusing on the employee's functions, some courts have taken a "totality of the circumstances" approach when determining if an employee qualified as a minister. One such court was the Seventh Circuit in Grussciott, which was that court's "first opportunity. .. to address the ministerial exception in light of Hosanna-Tabor." 882 F.3d at 658.
            There, the plaintiff's job titles ("grade school teacher" and/or "Hebrew teacher") and her use of those titles, where she neither held herself out "as an ambassador of the Jewish faith, nor. .. understood that her role would be perceived as a religious leader[,]" did not necessarily support a finding that the teacher was a minister under Hosanna-Tabor. Id. at 659. Nevertheless, the Seventh Circuit decided the teacher was a minister because, among other reasons, the school "expected its Hebrew teachers to
                                                            Page 40 of 54
integrate religious teachings into their lessons[,]" id. at 559; the teacher's resume "tout[ed] significant religious teaching experience," which the principal identified as a "critical" factor in deciding to hire her, id.; "the substance of [the teacher's] title as conveyed to her and as perceived by others entail[ed] the teaching of the Jewish religion to students[,]" id. at 660; and, "[the teacher] performed 'important religious functions' for the school[]" because she "taught her students about Jewish holidays, prayer, and the weekly Torah readings [and] she practiced the religion alongside her students by praying with them and performing certain rituals." Id. at 660 (internal citation omitted).
            In reaching the conclusion that the teacher was a minister, the Seventh Circuit noted that "at most two of the four Hosanna-Tabor factors [we]re present." Id. at 661. However, the court observed, "the same four considerations [outlined in Hosanna-Tabor] need not be present in every case involving the [ministerial] exception," id. at 658, and cautioned against "drawing a distinction between secular and religious teaching . . . when doing so involves the government challenging a religious institution's honest assertion that a particular practice is a tenet of its faith." Id. at 660. The Seventh Circuit ultimately concluded that "the Supreme Court's decision [in Hosanna-Tabor was] to impose, in essence, a totality-of-the-circumstances test." Id. at 661.
C. Strict Adherence To The Hosanna-Tabor Factors In  Determining Whether An Employee Qualifies As A "Minister" 
            Given the functional approach accepted by the majority of jurisdictions and, in particular, by the SJC in Temple Emanuel, DeWeese-Boyd's argument for strict adherence to the four factors announced in Hosanna-Tabor, and her reliance on Biel v. 
                                                            Page 41 of 54
St. James Sch., 911 F.3d 603 (9th Cir. 2018), in support of that argument are unpersuasive.
            The Ninth Circuit's decision in Biel appears to be the only decision of a Federal Circuit Court that has broken from the functional approach traditionally applied in applying the ministerial exception and rigidly applied the four factors of Hosanna-Tabor. In that case, the plaintiff was a fifth grade teacher at a Catholic elementary school.[29] Id. at 605. Her duties included praying with her students twice daily, taking her students to monthly Mass, and teaching them about the Catholic faith. Id. at 605. Nevertheless, the Ninth Circuit concluded that the plaintiff was not a minister because, compared to the teacher in Hosanna-Tabor, the plaintiff had a less religious title and background, received less religious training, had a smaller role in teaching religion, and did not hold herself out as a minister. Id. at 608-610. The Ninth Circuit reasoned that, even though the plaintiff "taught lessons on the Catholic faith[, and] incorporated religious themes and symbols into her overall classroom environment and curriculum, . . this shared characteristic alone" was not sufficient to confer ministerial status. Id. at 609.
            Since Biel, the Ninth Circuit has faced criticism for this decision. Most notably, in June 2019, after it declined to rehear Biel en banc, nine members of the Ninth Circuit issued a dissent stating, in part:
By declining to rehear this case en banc, our court embraces the narrowest construction of the First Amendment's "ministerial exception" and splits from the consensus of our sister circuits that the employee's ministerial function should be the key focus. . . . The panel majority's approach conflicts with Hosanna-Tabor, decisions from our court and sister courts, decisions from state supreme
---------------------------
[29] "Biel d[id] not dispute that [the defendant school], as a part of the Roman Catholic Archdiocese of Los Angeles, [wa]s the type of religious organization that could potentially invoke the ministerial exception as a defense." Id. at 607.
                                                            Page 42 of 54
courts, and First Amendment principles. And it poses grave consequences for religious minorities. . . whose practices don't perfectly resemble the Lutheran tradition at issue in Hosanna Tabor.
Biel v. St. James Sch., 926 F.3d 1238, 1239— 1240 (9th Cir. 2019) (Nelson, J., dissenting from denial of rehearing en banc, with whom Bybee, J., Callahan, J., Bea, J., M. Smith, J., Ikuta, J., Bennett, J., Bade, J., and Collins, J. joined); see also Sterlinski v.  Catholic Bishop of Chicago, 934 F.3d 568, 570 (7th Cir. 2019) (criticizing Biel for "disregarding what Biel's employer (a Roman Catholic school) thought about its own organization and operations," and, instead, asking "how much like [the plaintiff in Hosanna-Tabor] a given plaintiff is, rather than whether the employee served a religious function"). As such, this Court will not follow the minority approach adopted by the Ninth Circuit and advanced by DeWeese-Boyd.
D. Application Of The Kirby Framework In Determining Whether An Employee Qualifies As A "Minister" 
            In a pair of decisions that addressed the ministerial exception for the first time after Hosanna-Tabor, the Supreme Court of Kentucky refused to adopt an "inelastic approach" and, like the Seventh Circuit in Grusspott, ruled that "[t]he legal determination of a minister, instead, requires a review of the totality of the circumstances surrounding the plaintiffs employment." Kant v. Lexington Theol. Seminary, 426 S.W.3d 587, 591 (Ky. 2014). More significantly, the Supreme Court of Kentucky provided specific guidance for trial courts to use in determining the ministerial status of an employee after Hosanna-Tabor.
            Acknowledging that the Hosanna-Tabor Court "did not provide[] any substantial guidance on how a court should determine if an employee is a minister for ministerial
                                                            Page 43 of 54
exception purposes," id., the Court stated, "that a trial court should undergo the following review" in making such a determination:
When considering the formal title given, a trial court should weigh whether the title is inherently, exclusively, or primarily religious. The consideration of the substance reflected in the title should include the duties and responsibilities associated with the title. The trial court, in looking to the associated duties and responsibilities, may look at whether they carried substantial religious significance, involved supervision or participation in religious ritual and worship, or spreading the tenets or doctrine of the faith. The employee's own use of the title should include consideration of whether the position involved, expected, or required proselytizing on behalf of the religious institution. Or, did the employee use the title in a manner that would indicate to the members of the particular faith community or to the public that he was a representative of the religious institution authorized to speak on church doctrine. Finally, consideration of the important functions performed for the religious institution should involve a review of whether those functions were essentially liturgical, closely related to the doctrine of the religious institution, resulted in a personification of the religious institution's beliefs, or were performed in the presence of the faith community.
Id. at 591 —592 (citing Kirby v. Lexington Theol. Seminary, 426 S.W.3d 597, 613 -614 (Ky. 2014) (emphasis added).[30] "If, after the consideration of these factors, in light of the totality of the circumstances, the trial court finds an employee is a minister under the law, the religious institution is entitled to the benefit of the ministerial exception." Kirby, 426 S.W.3d at 614.
            After exhaustive consideration of cases applying Hosanna-Tabor, and reported decisions prior to Hosanna-Tabor, this Court believes that the framework announced by the Supreme Court of Kentucky in Kirby is an excellent, thoughtful, pragmatic approach to determining whether an employee qualifies as a "minister" after Hosanna-Tabor. To be sure, as the above highlighted portion of the Kirby framework illustrates, it carries on
---------------------------
[30] The Supreme Court of Kentucky issued the decisions in Kant and Kirby on the same day.
                                                            Page 44 of 54
the functional approach in many ways. Moreover, the Kirby framework appears to be mindful of the overarching purpose of the ministerial exception: avoidance of governmental interference in the internal decision-making by a religious institution regarding the retention, promotion, and hiring of "any 'employee' who leads [it], conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith." Hosanna-Tabor, 565 U.S. at 199 (Alito, J., concurring with whom Kagan, J., joined). As such, this Court will adopt the Kirby framework here.
            In Kirby, the Supreme Court of Kentucky considered whether a tenured professor of a seminary, "teaching Christian social ethics for fifteen years," was a minister for purposes of the exception. Id. at 603. After ruling that "it is beyond question that the [defendant] Seminary exists as a religious institution under the ministerial exception[,]" id. at 609, the Court in Kirby turned its attention to "[t]he determination of whether [the plaintiff] [wa]s a ministerial employee, [which] [wa]s much more complicated than the determination of the Seminary's religious-institution status." Id. at 611. The Court ruled that the fact that "[the plaintiff] [wa]s not ordained . . . [wa]s not dispositive. Given [his] extensive involvement in the Seminary's mission, religious ceremonies, and the subject matter of Kirby's teaching, it [wa]s clear that [the plaintiff] [wa]s a ministerial employee." Id. at 611.
            In reaching the conclusion that Kirby was a minister, the Court considered the following: (a) in hiring Kirby, "the Seminary. .. 'issued a call to carry out [his] ministry by serving as Instructor of Church and Society[,]" id. at 611; (b) "Kirby was tasked with carrying out the mission of the Seminary to prepare students for the ministry of Jesus Christ[,]" id.; (c) "Kirby's teaching focused on 'helping students understand what the
                                                            Page 45 of 54
basic socio-ethical issues [we]re and the nature of the Christian (or Christ-like) response' and "emphasiz[ed] 'Christian methods of moral judgment" [as an] important aspect° of his professorial role[,]" _id.; (d) "Kirby began each class with a voluntary participatory prayer regarding the social issues and injustices he taught about[,]" id. at 611 –612; and, (e) "Kirby participated in chapel services, convocations, faculty retreats, and other religious events [and he] preached on numerous occasions at both his own [ ] congregation and various Christian Church (Disciples of Christ) congregations." Id.
            In sum, after consideration of the above in light of the framework previously announced, the Court:
[C]onclude[d] that Kirby [wa]s closely connected to the tenets of the faith espoused by the Seminary and actively involved in the promotion of the Seminary's mission. As a professor at an ecumenical Seminary, instructing on Christian principles, Kirby serve[d] as a representative of the Seminary's message. Kirby ha[d], on multiple occasions, served as the Seminary's official representative, ambassador, and voice to the faithful.
            . . .
Kirby satisfie[d] most of the factors listed above. He gave sermons on multiple occasions, served communion, taught classes on Christian doctrine, opened class with prayer each day, affirmatively promoted students' development in the ministry, and served as a representative—a literal embodiment—of the Seminary at events on multiple occasions. The record is clear that Kirby conducted worship services, important religious ceremonies and rituals, and acted as a messenger of the Seminary's faith. He [wa]s most certainly a ministerial employee of the Seminary.
Id. at 612 – 613 (footnote omitted), 614.
            Most importantly for the case here, the Kirby Court:
[P]ause[d] to emphasize the link between the employee's title or conduct and the actual tenets or doctrine of the religious institution. It is important that as a ministerial employee, the employee be involved with the tenets of the faith. As detailed in Kant, an employee simply engaging in religious discourse cannot serve
                                                            Page 46 of 54
as a minister of the religious institution without involving himself in the doctrine or tenets of the faith. Simply promoting the mission of the religious institution alone is not sufficient.
Id. at 613 n.63 (emphasis added).
            In Kant, decided the same day as Kirby, the Supreme Court of Kentucky was "present[ed] [with] the question [of] whether the ministerial exception categorically applie[d] to all professors employed by seminaries." Kant, 426 S.W.3d at 588. In that case, "Laurence Kant [("Kant")] was a tenured Professor of Religious Studies at Lexington Theological Seminary, employed to teach courses on several religious and historical subjects. The Seminary terminated his employment, and Kant challenged the legitimacy of his termination by filing [an] action for breach of contract." Id.
            The Court in Kant "h[e]ld that Kant was not a ministerial employee of the Seminary." Id. at 589. In doing so, the Court "reject[ed] a categorical application of the ministerial exception that would treat all seminary professors as ministers under the law. Each case must be reviewed on the totality of its facts as [it] outlined in Kirby." Id. "[Professor] Kant, as opposed to Kirby, did not participate in significant religious functions, proselytize, or espouse the tenets of the faith on behalf of his religious institutional employer." Id. (emphasis added).
            Faculty at the Seminary in Kant (i.e., the same seminary as in Kirby) were expected to adhere to a Faculty Handbook, which "stated the fundamental responsibility of faculty 'shall be to uphold the purpose of [the] Seminary to prepare faithful leaders for the Church of Jesus Christ and, thus, to strengthen the Church's participation in God's mission for the world." Id. at 589 — 590. Further, "although there was no ordination requirement, faculty were expected `to serve as models for ministry[,]" id. 590, and
                                                            Page 47 of 54
"were 'expected' but not required to participate in Seminary worship services and convocations." Id. Moreover, as the Court observed:
In the circumstances of the instant case, we find it important to emphasize the connection between the religious institution's employee and the doctrine or tenets of the religious institution. A minister, in the commonly understood sense, has a very close relationship with doctrine of the religious institution the minister represents. The members of the congregation or faith community view a minister as one who is, among other things, the face of the religious institution, permitted to speak for the religious institution, the embodiment of the religious institution's tenets, and leader of the religious institution's ritual. Kant did none of these things.
Id. at 592.
            Upon becoming a tenured professor, Kant's title was "Associate Professor of the History of Religion." Id. at 592. During his employment, Professor Kant participated in chapel services, was a scripture reader at two ordination ceremonies, once served as a greeter for a communion service, once gave an ordination sermon, once gave the benediction a the student orientation chapel service, served as Chair of the Convocation Committee for two years, and gave the invocation at two faculty meetings. Id. at 593. "Kant acknowledge[d] his participation in Seminary events, including convocations and chapel services. But[,] he claim[ed] he never did so as a Christian, rather, as a teacher and Jew." Id. "In light of Kant's participation in the Seminary and its mission," the Court turned "to the Kirby factors [to] determine if Kant qualifie[d] as a minister," id., and held that Professor Kant was not a minister for the purposes of the ministerial exception. Id. at 596.
            In so holding, the Kant Court stated: (a) "Kant's formal titles given by the Seminary were not inherently, exclusively, or primarily religious," although "serving as a professor of [religious studies and history] inherently involves religion, . . . [b]ut there
                                                Page 48 of 54
[wa]s no indication that the title ha[d] any significance to the particular religious views of the Seminary[,]" id.; (b) "the substance reflected in Kant's title similarly indicate[d] an absence of any connection to the faith of the Seminary[,]" id. at 594; (c) although, "the duties and responsibilities associated with Kant's title include[d] the promotion of the Seminary's mission and participation in Seminary events. . . these duties alone [we]re [not] enough to label Kant a ministerial employee[,]" because his "role did not 'involve, expect, or require proselytizing on behalf of the religious institution[,]" id.; (d) "Kant did not, in the context of the Seminary's strong connection with the doctrine of the Christian Church (Disciples of Christ), perform any 'important functions' for the Seminary[,]" id.; and, (e) "the functions performed by Kant were not liturgical, did not personify the Seminary's beliefs, and were not performed in the presence of the faith community."[31] Id.
E. Application Of The Hosanna-Tabor Factors, The Kirby Framework, And The Functional Approach In This Case 
            In applying the Kirby framework (which necessarily involves the application of the Hosanna-Tabor factors) and the functional approach outlined above, this Court concludes that DeWeese-Boyd does not qualify as a ministerial employee for several reasons. First, notwithstanding the numerous aforementioned provisions in Gordon College's Faculty Handbook, other governing documents, [32] and other places in the
---------------------------
[31] "As Kant admit[ed], as a practicing Jew, he [wa]s not licensed as Christian clergy or qualified to partake in or lead any Christian rites of worship. While an employee practicing a different religion than the religious institutional employer [wals not dispositive, it [wa]s indicative of the employee's relationship to the tenets of the faith espoused by the Seminary." Id.
[32] In addition to other governance documents, such as the Social Work Handbook and the Memorandum of Understanding, there are numerous instances in the record where DeWeeseBoyd acknowledged Gordon College's expectation that she would integrate the Christian faith into her teaching. These include the 2002 cover letter accompanying her first integration paper and her 2009 application for tenure and paper entitled "Reflections on Christian Scholarship."
                                                            Page 49 of 54
record mandating that faculty members support and promote Gordon's evangelical Christian doctrine and mission (e.g., expecting faculty members to be "both educators and ministers to Gordon's students," to "approach[] [their] educational tasks from within the fixed reference points of biblical theism," "to be fully prepared in all facets of their tasks as Christian teachers and advisors, both inside and outside the classroom," and, "to strive to engage students in their respective disciplines from the perspective of the Christian faith and to teach with accuracy and integrity."), "[t]he simple promotion of a religious institution's mission, alone, provides little insight into whether the duties or responsibilities undertaken by the employee 'carried substantial religious significance." Kant, 426 S.W.3d at 594 (footnote omitted). To be sure, "mission promotion in no way indicates whether the employee's duties or responsibilities involved 'supervision or participation in religious ritual and worship[] or spread[ing] the tenets or doctrine of the faith.' [Instead,] [t]he conduct said to be in promotion of the religious institution's mission must be linked to the tenets of the religious institution's faith." Id. (citations and footnotes omitted). Here, although DeWeese-Boyd was expected to integrate the principles and concepts that underlie the Christian evangelical tradition with her teaching, she had no religious duties and did not actively promote the tenets of evangelical Christianity.
            Second, DeWeese-Boyd's "role did not 'involve, expect, or require proselytizing on behalf of [Gordon College]." Id. Based on the record before the Court, the Court concludes that Gordon's requirement of the integration of faith and teaching by a social work professor did not involve any expectation that she would actively proselytize or preach religious tenets or doctrine to the students in her classes.
                                                            Page 50 of 54
            Third, DeWeese-Boyd did not "use h[er] role in any way that would indicate to the members of the faith [s]he was a 'representative of the religious institution authorized to speak on church doctrine." Id. She neither held a ministerial title nor held herself out as a minister. Rather, like Professor Kant, DeWeese-Boyd's "professorial role[, at most,] exemplifie[d] the distinction between 'teaching about religion' and 'the teaching of religion.' [In fact,] [t]he record does not evince any example of [DeWeese-Boyd] holding h[er]self out as an employee authorized to speak on church doctrine." Id. 594 — 595.
            Fourth, DeWeese-Boyd did not perform any important religious functions for Gordon College. In making this determination when applying the Kirby framework, the Court "consider[s] whether the functions performed by [DeWeese-Boyd] 'were essentially liturgical, closely related to the doctrine of the religious institution, resulted in a personification of the religious institution's beliefs, or were performed in the presence of the faith community." . at 595. Even if one assumes DeWeese-Boyd may have "dealt closely with religious texts, biblical languages, and scriptural interpretations[,]" (which would be stretching the summary judgment record before this Court) id., and may even have been, in a general sense, "a 'source of religious instruction," id.; DeWeese-Boyd "did not play 'an important role in transmitting [Gordon's] faith to the next generation." . Other than attending on-site chapel and local church services with her students, on an unknown number of occasions, DeWeese-Boyd performed almost no liturgical or ecclesiastical functions for Gordon, especially when compared to the functions performed by Professor Kant and teachers in other cases applying the ministerial exception. See e.g., Herx, 48 F. Supp. 3d at 1176 — 1177. She was not responsible for leading students in prayer or devotional exercises; she did not lead
                                                            Page 51 of 54
chapel services, or even select liturgy, hymns, or other content for chapel services; she did not teach religion or the Bible; and, she did not play a particular role as a minister or spiritual leader.
            In sum, although DeWeese-Boyd had a seminary degree when hired, she did not have a religious title at Gordon, [33] she did not represent herself as a minister, she did not play an integral (or any) role in religious services, she did not convey Christian doctrine to the Gordon community, she did not lead her students in prayer, and she did not perform any religious functions. Although she was responsible for integrating the Christian evangelical faith into her teaching and advancing Gordon College's distinctively Christian perspective and worldview, "[t]he primary focus under the law is on the nature of the particular employee's work for the religious institution." Kant, 426 S.W.3d at 595. DeWeese-Boyd's work did not make her a minister for purposes of the ministerial exception.[34] See Richardson v. Northwest Christian Univ., 242 F. Supp. 3d 1132, 1145 (D. Or. 2017) (ministerial exception did not apply where "plaintiffs title, assistant professor of exercise science, was secular"; "plaintiff did not undergo any specialized religious training"; "although there [wa]s ample evidence plaintiff held herself out as a Christian, there [wa]s no evidence she held herself out as a minister"; and, although "plaintiff performed some important religious functions in her capacity as a professor[,] [and] [s]he was expected to integrate her Christianity into her teaching and demonstrate a maturing Christian faith[,]" her "religious function was wholly secondary
---------------------------
[33]Referring to faculty members in passing as "ministers" in the Faculty Handbook does not make them ministerial employees for purposes of the exception.
[34] The Court recognizes that, as a religious institution, Gordon College has the right to shape its own faith and mission through its appointments, and a Court should not entangle itself in these ecclesiastical decisions. However, the law is clear that antidiscrimination and other laws apply to decisions by religious institutions that do not involve ministers, such as DeWeese-Boyd.
                                                            Page 52 of 54
to her secular role: she was not tasked with performing any religious instruction and she was charged with no religious duties such as taking students to chapel or leading them in prayer."); Bohnert v. Roman Catholic Archbishop of San Francisco, 136 F. Supp. 3d 1094, 1114 (N.D. Cal. 2015) (Catholic high school biology teacher was not a minister where, although she spent one-fifth of her time performing ministry duties, the duties were mostly logistical rather than providing actual spiritual or religious guidance); Braun v. St. Pius X Parish, 827 F. Supp. 2d 1312, 1319 (N.D. Okla. 2011) (teacher of secular subjects was not a minister; although plaintiff had to "adopt and embrace the concept that teachers are ministers of the Catholic faith," plaintiff was required "to 'teach and act in accordance with the precepts of the Catholic Church' and to 'aid in the Christian formation of students," the defendants failed to "articulate[] specific responsibilities or actions that might be considered ministerial," such as leading students in prayer); Redhead v. Conference of Seventh-Day Adventists, 440 F. Supp. 2d 211, 221 (E.D. N.Y. 2006) (teacher was not a minister where her "teaching duties were primarily secular; those religious in nature were limited to only one hour of Bible instruction per day and attending religious ceremonies with students only once per year"); Guinan v.  Roman Catholic Archdiocese of Indianapolis, 42 F. Supp. 2d 849, 852 (S.D. Ind. 1998) (teacher was not a minister, notwithstanding that she "did participate in some religious activities as a teacher at All Saints, but it cannot be fairly said that she functioned as a minister or a member of the clergy"); Geary v. Visitation of Blessed Virgin Mary Parish  Sch., 7 F.3d 324 (3d Cir. 1993) (refusing to apply the ministerial exception to a lay teacher at a Catholic church school, notwithstanding the teacher's general employment obligation to be a visible witness to the Catholic Church's philosophy and principles);
                                                            Page 53 of 54
DeMarco v. Holy Cross High Sch., 4 F.3d 166, 172 (2d Cir. 1993) (refusing to apply the ministerial exception to a math teacher at a Catholic high school because the relationship between employee and employer was not "so pervasively religious" that it was impossible to engage in an employment discrimination inquiry without serious risk of offending the Establishment Clause).
            At bottom, "[i]f [DeWeese-Boyd] was a minister, it is hard to see how any teacher at a religious school would fall outside the exception." Richardson, 242 F. Supp. 3d at 1145. As such, Defendants' Motion is DENIED and Plaintiff's Cross-Motion is ALLOWED.
ORDER
            For the reasons stated above, it is hereby ORDERED that:
            1. Defendants' Motion For Summary Judgment On The First Amendment Ministerial Exception (Paper No. 33) is DENIED.
            2. Plaintiff's Cross-Motion On The First Amendment Ministerial Exception (Paper No. 33.2) is ALLOWED.
            3. The affirmative defense of the ministerial exception is HEREBY DISMISSED.
@/s/Jeffrey T. Karp Associate Justice, Superior Court
@April 2, 2020
                                                            Page 54 of 54
xxz